402 So.2d 266 (1981)
Gaston LEVESQUE and Myrtle Levesque
v.
Milton R. SABA.
No. 11698.
Court of Appeal of Louisiana, Fourth Circuit.
July 21, 1981.
*267 Kronlage, Dittmann & Maselli, New Orleans, Joseph Maselli, Jr., New Orleans, for Gaston Levesque, et al., plaintiff-appellee.
Raymond S. Childress, Metairie, for Milton R. Saba, defendant-appellant.
Thomas E. Loehn, New Orleans, for First of Georgia Underwriters Insurance Co., third party defendant-appellee.
Before SAMUEL, SCHOTT and GARRISON, JJ.
*268 SAMUEL, Judge.
Plaintiffs, Mr. and Mrs. Gaston Levesque, filed this wrongful death and survival suit against defendant, Milton R. Saba, for damages resulting from defendant's fatal shooting of their son on December 30, 1976.
Defendant answered, denying liability to plaintiffs, and filed a third party demand against the New Orleans Police Department and the City of New Orleans, alleging negligence of the police department in failing to locate the body of plaintiff's son in time to save his life. Defendant also filed a third party demand against First of Georgia Underwriter's Insurance Company, his home owner's liability insurer. Thereafter, plaintiffs added First of Georgia and the City of New Orleans as defendants.
The matter was tried to a jury, which found the defendant had used undue force in shooting the decedent. Judgment was rendered in favor of plaintiffs and against the defendant, Saba, in the amounts of $50,000 ($25,000 each) for loss of love and affection of their son, $3,500 for reimbursement of funeral expenses, and $5,000 for pain and suffering sustained by decedent prior to his death. In response to specific written interrogatories, the jury found defendant had intentionally shot decedent, thus excluding coverage under the policy, and judgment was rendered in favor of the original and third party defendant, First of Georgia. In addition, a directed verdict was granted by the judge in favor of the City of New Orleans and the New Orleans Police Department, dismissing those original and third party defendants.
The defendant, Saba, has appealed. In this court he contends: (1) The trial court erred in finding he had "used undue force in defending himself against the attack of the decedent" and in finding his actions "were `intentional' within the scope of the insurance policy issued to him" by First of Georgia; and, alternatively, (2) the award is excessive.
The record reflects the only eye witnesses to the shooting were defendant and decedent. Defendant testified:
He and decedent were shareholders in a corporation which owned a trailer park in Kenner, Louisiana. Serious disputes arose between them, foreclosure was filed by the holder of the mortgage on the trailer park, and the corporation was judicially dissolved. He received a telephone call from decedent, requesting that he meet decedent on December 30, 1976 in order to sign documents to completely wind up the liquidation. The intended meeting place was decedent's place of employment at the office of the Small Business Administration in a New Orleans building known as the Plaza Towers. He met decedent in the Small Business Administration's office on the 17th floor of the building and, for reasons not explained, the two proceeded in the elevator to the 19th floor, which he later learned was totally vacant.
As he and decedent exited the elevator on the 19th floor, decedent threatened to kill him and struck him several times. The first blow struck by decedent temporarily blinded him. He drew a pistol, which he had brought with him because he feared decedent, and shot three times in the direction from which the blows were coming. When he regained his eyesight, he saw decedent lying wounded on the floor, told decedent to ask God's forgiveness, and pushed the down button on the elevator to seek help.
He found himself in the lobby of the Plaza Tower without access to a telephone. He did not know why he did not stop at decedent's office on the 17th floor but, because his automobile was just outside the building, he got into it in order to reach a telephone at a service station near the office building. However, when he arrived at the anticipated location of the service station, it was no longer there.
At that moment he realized he was only a short distance from the office of an attorney who represented him in a personal injury suit, so he proceeded immediately to his attorney's office. He spoke to his attorney's associate, and an anonymous telephone call was placed by the attorney's secretary to the New Orleans Police Department *269 informing it that a shooting had taken place in the Plaza Tower office building. The telephone call was placed no more than five minutes after the shooting, but the exact location of the shooting was not given the police. When he left the 19th floor of the Plaza Tower decedent was conscious and in pain.
He was deathly afraid of the decedent, and that was the reason he brought the gun with him when he went to the Plaza Tower. He knew decedent lifted weights as a hobby, and was physically strong. Decedent had beaten him on at least one occasion, and had threatened bodily harm to the mortgage holder who foreclosed on the trailer park.
Plaintiffs offered the testimony of Joseph Miceli, a detective of the Homicide Division of the New Orleans Police Department who investigated the shooting. Miceli testified:
The first notification to the police department of a shooting at the Plaza Tower was received by the Police Department at 10:33 a. m., and was anonymous. Police went to the building, but because they were not given a definite location for the shooting, they did not discover decedent's body. At 1 p. m. that day Miceli was instructed to go to the office of defendant's attorney to investigate the shooting. He and the attorney went to the Plaza Tower building and eventually discovered decedent's body at 1:45 p. m. on the 19th floor.
He saw defendant on the same day between 2:30 and 3 o'clock in the afternoon. At that time defendant appeared to be nervous, but the only indication that he had been in a fight was a bruise on the inside of his lip. No other cuts or abrasions were visible to him, and the mug shot taken by the police on that day and introduced into evidence likewise indicates no evidence of trauma to defendant.
He did not observe powder burns on decedent's clothing and, based on his experience gained in investigating approximately 800 shooting deaths in nine years, a gun would have to be about 3 feet from the shooting victim to leave power burns on his clothing.
Defendant corroborated his testimony that he was beaten by decedent with the testimony of Gertrude Parker, a resident of the trailer park formerly owned by defendant and decedent. She testified defendant attempted to collect rent from her, and at that time decedent ran up to defendant and began striking him about the back in a forceful manner. Defendant did not attempt to fight back, but merely pleaded with decedent to refrain from hitting him and discuss the matter like gentlemen.
Defendant also called James A. Malinda, holder of the mortgage on the trailer park formerly owned by decedent and defendant. Malinda testified the mortgage payments were overdue, and he referred the matter to his attorney to institute foreclosure proceedings. Thereafter decedent telephoned him, called him and his wife vile names, and threatened both their lives if Malinda did not stop the foreclosure. He also testified that at the trial of those proceedings the decedent grabbed him in the restroom and threatened to kill him.
Defendant also called Kerry Cuccia, an attorney appointed by the court as liquidator of the corporation owned by defendant and decedent. Cuccia testified he met with both men personally. In response to a direct question, he stated that while defendant never made threats in his presence against the decedent, decedent "in a manner of speaking," made threats against defendant. These threats were in the form of "I am going to get even for this," or "I am going to get him for this." Cuccia testified he related these threats to defendant and advised defendant to stay away from decedent because of the anger he displayed. On cross examination, Cuccia stated he did not interpret decedent's statements as threats to kill defendant, but anticipated possible physical violence in view of decedent's anger and physically imposing stature.
Finally, it should be mentioned that defendant admitted pleading guilty to manslaughter after having been charged with first degree murder in the shooting of decedent. He explained his decision to plead guilty to a lesser charge by the fact that, at *270 the time of his plea, he had spent 46 days and nights in Parish Prison under intolerable circumstances. He testified the prison was dirty, aggravated his sinus condition, and caused him to lose weight. He was advised by his attorney that the charge could result in life imprisonment if found guilty, and decided to plead guilty to the lesser charge approximately 14 days after it was offered when he learned he would be released immediately from prison on probation.
In Louisiana, a plaintiff cannot recover damages for battery if he is at fault in provoking the difficulty in which he is injured.[1] However, in a physical altercation, an aggressor may become a victim if the original victim resorts to excessive violence and unnecessary force to repel the original assault.[2]
In general, the peculiar facts and circumstances of each case determine whether the force used to repel the aggression was necessary and reasonable.[3] Also generally, one is not justified in using a dangerous weapon in self defense if the attacking party is not armed but only commits battery with his fists or in some manner not inherently dangerous to life.[4] However, resort to dangerous weapons to repel an attack may be justifiable in exceptional cases when the fear of danger of the person attacked is genuine and founded on facts likely to produce similar emotions in reasonable men.[5] Under this rule it is only necessary that the actor have grounds which would lead a reasonable man to believe force is necessary, and that he actually so believes. All facts and circumstances must be taken into account to determine the reasonableness of the actor's belief, but detached reflections or a pause for consideration cannot be demanded under circumstances which by their nature require split second decisions. Various factors relied upon by the courts to determine the reasonableness of the actions of the party being attacked are the character and reputation of the attacker,[6] the belligerence of the attacker, a large difference in size and strength between the parties, an overt act by the attacker, threats of serious bodily harm, and the impossibility of a peaceful retreat.[7]
In this court, defendant basically argues we should substitute our decision for that of the jury. However, a reviewing court must give substantial weight to the conclusions of the trier of fact, and is obliged not to disturb reasonable evaluations of credibility and reasonable inferences of fact, even if other evaluations and inferences are also reasonable.[8] Here, there are enough inconsistencies in the record to justify the jury holding that defendant used excessive force in shooting the decedent.
Defendant testified he feared the decedent, yet he voluntarily went to the decedent's office at the latter's request. In addition, he chose to arm himself with a gun. The reason for the trip to the 19th floor also is unexplained, and the jury could well have questioned defendant's motive in going to another floor. Likewise, defendant's story leaves room for doubt when he testified that decedent's first blow rendered him "temporarily blind" but he was nevertheless able to draw his pistol, fire three shots, and strike decedent with each shot. As no powder burns or marks were left on decedent's clothing, the jury could well have inferred decedent withdrew or was not within sufficient proximity to inflict harm on defendant. Moreover, the absence *271 of marks or evidence of a beating (except for a bruised inner lip) also could lead the jury to conclude defendant was not under serious attack or that excessive force had been used. Disparity in time between the actual shooting and when defendant's attorney helped the police discover the body could have led the jury to conclude defendant's primary concern was with his legal defense and not with attempting to save the life of his attacker. Finally, we mention the obvious, that one of a jury's primary functions is to be a judge of credibility, and here this jury reasonably did not accept some of the pertinent parts of defendant's testimony.
Under all of the circumstances presented by the evidence, we conclude the jury did not commit error in holding in favor of plaintiffs and against the defendant, and in the absence of manifest error, we cannot disturb the jury's finding.
Next, defendant complains the award of $58,500 against him is excessive. As we have said, the award consisted of $25,000 each as damages to Mr. and Mrs. Levesque for the loss of their son, $3,500 for funeral expenses, and $5,000 for pain and suffering by the decedent prior to his death.
In replying to this defendant argument plaintiffs rely on the Supreme Court case of Reck v. Stevens[9] which, in pertinent part, stated the role of the appellate review of trial court damage awards as follows:
"Before a trial court award may be questioned as inadequate or excessive, the reviewing court must look first, not to prior awards, but to the individual circumstances of the present case. Only after analysis of the facts and circumstances peculiar to this case and this individual may a reviewing court determine that the award is excessive.
....
Thus, the initial inquiry must always be directed at whether the trier court's award for the particular injuries and their effects upon this particular injured person is, a clear abuse of the trier of fact's `much discretion,' La.Civ.C. art. 1934(3) in the award of damages. It is only after articulated analysis of the facts discloses an abuse of discretion, that the award may on appellate review, for articulated reason, be considered either excessive, Carollo v. Wilson, 353 So.2d 249 (La.1977); Schexnayder v. Carpenter, 346 So.2d 196 (La.1977), or insufficient, Olds v. Ashley, 250 La. 935, 200 So.2d 1 (1967). Only after such determination of abuse has been reached, is a resort to prior awards appropriate under Coco for purposes of then determining what would be an appropriate award for the present case.
In the initial determination of excessiveness or insufficiency, an examination of prior awards has a limited functionif indeed the facts and circumstances of the prior awards are closely similar to the present. The prior awards may serve as an aid in this determination only where, on an articulated basis, the present award is shown to be greatly disproportionate to past awards (not selected past awards, but the mass of them) for (truly) `similar' injuries, see Coco at 341 So.2d 334.
However, absent an initial determination that the trial court's very great discretion in the award of general damages has been abused under the facts of this case, the reviewing court should not disturb the trier's award. Wilson v. Magee, 367 So.2d 314 (La.1979)."
Under Reck the initial determination is whether the trial court abused its great discretion in awarding damages to a particular plaintiff under the circumstances of the case, and only after such a determination is made may a reviewing court resort to the mass of similar cases in the jurisprudence to determine an appropriate award.
We conclude the jury did not abuse its discretion by awarding $25,000 to each of decedent's parents. The evidence indicates decedent was the oldest of plaintiffs' *272 five children.[10] He was an honor student at Jesuit High School in New Orleans, and received an appointment to the United States Military Academy.[11] Although he established a separate residence during his college days, he always lived within a two mile radius of his family. He was an integral part of a close-knit family, and organized and participated in most of the family gatherings. On the day he was shot he was scheduled to go on a family trip.
He did not support his parents, but he provided spending money for his brothers and sisters. He also gave his parents household appliances and money which allowed them to travel to Hawaii, British Columbia and Mexico and back. The decedent's father testified he wakes up at night thinking about the things his son did for him and the good times they had together. Decedent's mother stated that as the first and oldest child, he was special and the person she called upon for emotional support in times of crisis, particularly when her husband would have heart attacks. These facts show a large amount of love, affection, and interdependence between plaintiffs and their deceased son. We cannot say the jury abused its discretion by awarding his parents $25,000 each for the loss suffered by his wrongful death.[12]
Likewise, we find the jury's award of $5,000 for the decedent's pain and suffering prior to his death was not excessive.[13] As previously stated, defendant admitted decedent was alive and conscious at the time defendant left him on the 19th floor of the Plaza Tower office building. The testimony of the assistant coroner who performed decedent's autopsy establishes decedent internally bled to death. He estimated decedent lived approximately one-half hour after the shooting. Plaintiffs called a thoracic surgeon who testified decedent probably lived about an hour after the shooting, since no major blood vessels had been destroyed by any of the three bullets. This award will not be disturbed.[14]
We do find error in the award for funeral expenses. That award was for $3,500, and the record is totally devoid of any evidence regarding funeral expenses or bills.
The final issue for our determination is whether the jury committed error by failing to cast First of Georgia in judgment.
The exclusionary language relied upon by this insurer declines coverage "to bodily injury or property damage which is either expected or intended from the standpoint of the insured." The insured in this situation is the defendant, who argues this provision is vague and uncertain, with the result that it must be interpreted against the insurance company. However, defendant does not explain how the wording of the policy exclusion is vague and uncertain.
On the contrary, interrogatories were submitted to the jury to answer in the case, one of which requested a determination of whether (1) defendant shot decedent intentionally, or (2) defendant expected to cause decedent bodily harm. The answer to this interrogatory was in the affirmative.
In this regard it is argued the jury was incorrect because testimony of the assistant coroner and thoracic surgeon established that while the shooting was a cause of decedent's death, it was secondary to the negligence of defendant by fleeing the scene and failing to properly summon medical help. The medical evidence indicated that decedent survived at least one-half hour after the shooting, and since no major arteries were hit by any of the bullets, that decedent's life could have been saved had he been given prompt medical attention. *273 The medical procedure could have been done within 2 minutes in an emergency room or by paramedics at the scene of the shooting. Consequently, it is contended the death was caused by defendant's negligence and did not come under the exclusionary clause of the insurance policy.
In response to a direct question, the defendant expressly testified that when he fired three shots in the direction from which the blows were coming at him, he expected to hit the decedent. Under these circumstances, we hold the language of the exclusionary clause of the policy is clear and unambiguous. The jury held defendant used excessive force in defending himself (if in fact his actions were defensive), and the fact situation before the court fits within the terms of the exclusionary language of the policy. The jury did not commit error by exonerating First of Georgia.[15]
For the reasons assigned, the judgment appealed from is amended by reducing the total amount awarded from $58,500 to $55,000, and, as thus amended, the judgment appealed from is affirmed. The defendant is cast for all costs.
AMENDED AND AFFIRMED.
NOTES
[1] Tripoli v. Gurry, 253 La. 473, 218 So.2d 563.
[2] Willis v. Willis, La.App., 287 So.2d 642.
[3] See Willis v. Willis, Id.
[4] Brasseaux v. Girouard, La.App., 269 So.2d 590.
[5] McCullough v. McAnelly, La.App., 248 So.2d 7.
[6] Babineaux v. Pernie Bailey Drilling Company, La.App., 335 So.2d 747.
[7] Mullins v. Pence, La.App., 290 So.2d 803.
[8] Arceneaux v. Domingue, La., 365 So.2d 1330; Canter v. Koehring Company, La., 283 So.2d 716.
[9] La., 373 So.2d 498, 501.
[10] They also raised a nephew from the age of 8.
[11] He was unable to accept this appointment because of a physical problem with his hand.
[12] See Walker v. St. Paul Ins. Companies, La. App., 343 So.2d 251; Meaux v. Wiley, La.App., 325 So.2d 655.
[13] Plaintiffs cite Walker v. St. Paul Ins. Companies, La.App., 339 So.2d 441, which awarded $2,000 for the pain and suffering of a decedent who lived approximately 15 minutes. On remand (343 So.2d 251) that award was increased to $5,000.
[14] See Walker v. St. Paul Ins. Companies, supra, notes 12 and 13; Temple v. Liberty Mutual Insurance Co., La.App., 336 So.2d 299.
[15] See Horde v. Foucha, La.App., 396 So.2d 441.