690 So.2d 914 (1997)
Jimmy V. SLAYTON, et al., Plaintiff-Appellant,
v.
A.S. McDONALD, et al., Defendant-Appellee.
No. 29257-CA.
Court of Appeal of Louisiana, Second Circuit.
February 26, 1997.
*915 Bobby L. Culpepper, Jonesboro, for Plaintiff-Appellant.
Francis C. Broussard, Monroe, for Defendant-Appellee.
Before MARVIN, C.J., and WILLIAMS and PEATROSS, JJ.
WILLIAMS, Judge.
The plaintiff, Jimmy V. Slayton, appeals a trial court judgment rendered in favor of the defendant, A.S. McDonald, rejecting plaintiff's claim for personal injuries sustained as the result of a shooting incident. For the reasons assigned below, we affirm the trial court's judgment.

FACTS
On the afternoon of May 20, 1994, fourteen-year-old Daniel McDonald and fourteen-year-old James Slayton had a disagreement while riding the school bus to their neighboring Dubach homes. Slayton was the larger of the two boys and was attending high school. McDonald was attending junior high school. The disagreement began when Slayton threw a piece of paper at McDonald. After McDonald threw the paper back at Slayton, Slayton threatened to come to McDonald's house. McDonald told Slayton not to come to his house. When asked about Slayton's reputation as a fighter, McDonald testified he had heard that Slayton had won fights against people larger than himself, and *916 that Slayton could "take care of himself pretty good."
Later that afternoon, after McDonald arrived at home, he went outside his house and saw Slayton walking up the long driveway toward him. Slayton testified that he went to McDonald's house because he wanted to talk to McDonald about "kicking and punching on little kids and about messing with me and stuff." There were no adults present at McDonald's home when Slayton arrived at the residence. McDonald yelled at Slayton to go home. However, Slayton kept walking up McDonald's driveway. Slayton testified that he did not hear McDonald's warning. After shouting the warning to Slayton, McDonald went into his house, got his twelve-gauge shotgun, came back outside and loaded the gun with # 7½ shot shells. McDonald testified that Slayton saw him load the gun; Slayton said that he did not. Again, McDonald asked Slayton to leave and Slayton refused.
McDonald then retreated into his home and called 911 to request help. McDonald testified that he closed the front door of his house after retreating inside. Slayton testified that the door was open. However, it is undisputed that the front door of the McDonald home did not have a lock and anyone could open it from the outside.
As McDonald spoke to the 911 operator, Slayton came inside McDonald's house. The transcript of the 911 conversation reveals that McDonald told Slayton to leave several times, to no avail. McDonald can be heard to say: "I think he's like sixteen. He's a lot bigger than me and he's in my house"; "Don't take another step towards me"; and, "If he keeps coming toward me I'm going to shoot him." (See Appendix A)
McDonald testified that Slayton pointed at his own leg, dared McDonald to shoot, and said that McDonald "didn't have the guts" to shoot. McDonald also stated that Slayton told him he was going to teach him a lesson and "kick my [McDonald's] ass." Slayton testified that after McDonald threatened to shoot him, he told McDonald that if McDonald shot him, he would get up and beat McDonald.
When asked if he was afraid when Slayton came into his house, McDonald testified that Slayton frightened him because "he [Slayton] had a crazy look in his eye. I didn't know what he was going to do after he didn't stop for the gun, I thought he must have been crazy." McDonald also told the 911 operator that "he's kinda crazy, I think." McDonald testified that Slayton "asked me if I could get him before he got to me and got the gun first. I was afraid that if he came past the gun that he was crazy enough to kill me."
At some point during the encounter, Slayton's younger sister, Amanda, arrived at the McDonald home and asked Slayton to leave because McDonald was armed. According to McDonald, Slayton refused to leave by saying "he's too scared to shoot me. He's about to cry." The 911 operator told McDonald several times not to shoot Slayton; McDonald said "I ain't gonna shoot him but in the leg. But I have to defend myself." Slayton testified that McDonald never pointed the shotgun at his head or chest.
What happened next was a matter of some dispute. On the 911 transcript, McDonald tells Slayton that "I might just count to three." Slayton testified that he was kneeling down because he was "resting waiting for the cops to get there so I could tell my story." However, Amanda Slayton and McDonald testified that Slayton was standing. Both Amanda and James Slayton testified that Slayton did not make a move toward McDonald, and Slayton testified that at all times during the incident, he was never more than two feet inside the McDonald home. However, McDonald testified that Slayton then began to count and to move "eight feet at least" into the home. On the tape of the 911 conversation, most of what Slayton says is inaudible, but, at the point where McDonald's states that he might count to three, Slayton can be heard to count "onetwo three." McDonald then shot Slayton once in the left knee. Slayton's grandmother arrived shortly thereafter, pulled Slayton out of the McDonald home and waited for the paramedics and law enforcement authorities to arrive.
McDonald testified that from his experience, a load of # 7½ shot did not do a great deal of damage to animals at ordinary hunting *917 distance, but he had never fired his shotgun at anything so close before. On the 911 tape, McDonald can be heard saying, "I ain't got but squirrel shot in here ..."
Nevertheless, according to one of Slayton's doctors, Dr. Richard I. Ballard, the shot charge caused Slayton a "devastating" and "severe" injury that will require knee fusion rendering his knee permanently stiff and the injured leg at least an inch shorter than the other leg. Slayton and his parents testified that the injury had caused Slayton tremendous pain and had drastically reduced or eliminated his ability to engage in activities he used to enjoy. Slayton is also unable to perform chores around the house. Moreover, plaintiff introduced evidence that his family had incurred $43,310.51 in medical costs and had lost $1,349.00 in wages due to doctor visits at the time of trial. Further, plaintiff anticipated at least one future operation on Slayton's knee.
Jimmy V. Slayton, James Slayton's father sued A.S. McDonald, Daniel McDonald's father, for damages arising out of this incident, and A.S. McDonald filed a reconventional demand seeking damages for mental anguish as a result of the shooting incident. The trial court rejected both claims. In written reasons for judgment, the court found that Slayton, "a much larger opponent who had a reputation for fighting," was the aggressor in the encounter and that McDonald acted reasonably under the circumstances in protecting himself, using only that force necessary to prevent a forcible offense against his person. From this adverse judgment, plaintiff appeals.

DISCUSSION
The plaintiff contends the trial court erred in finding that the defendant's son acted reasonably under the circumstances surrounding this incident, and thus, was justified in shooting the plaintiff's son in the leg. We do not find that the trial court erred.
An appellate court may not set aside a trial court's finding of fact unless that finding is manifestly erroneous or clearly wrong. Stobart v. State of Louisiana, Through the Department of Transportation and Development, 617 So.2d 880 (La.1993); Brooks v. Henson Fashion Floors, Inc. 26,378 (La.App. 2d Cir. 12/7/94), 647 So.2d 440. In order to reverse the trial court's findings, the appellate court must, after a review of the record in its entirety, find that there is no factual basis for the trial court's finding and that the finding is clearly wrong or manifestly erroneous. Brooks v. Henson Fashion Floors, Inc., supra. The issue to be resolved by the reviewing court is not whether the trier of fact was right or wrong, but whether the fact finder's conclusion was a reasonable one. Stobart v. State of Louisiana, Through the Department of Transportation and Development, supra.
When findings of fact are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact, because only the trier of fact can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Rosell v. ESCO, 549 So.2d 840 (La. 1989); Rich v. Tench Electric Motor Works, Inc., 26,072 (La.App. 2d Cir. 8/19/94), 642 So.2d 293. Credibility determinations are the function and prerogative of the trial court. Thomas v. Bryant, 25,855 (La.App. 2d Cir. 6/22/94), 639 So.2d 378.
LSA-C.C. Art. 2315 is the basis for tort liability in Louisiana. See Reyes v. State of Louisiana and State Department of Transportation and Development, 466 So.2d 538 (La.App. 3rd Cir.1985). However, Louisiana's aggressor doctrine precludes tort recovery where the plaintiff acts in such a way to provoke a reasonable person to use physical force in fear or anticipation of further injury at the hand of the aggressor plaintiff, unless the person retaliating has used excessive force to repel the aggression. Baugh v. Redmond, 565 So.2d 953, 958 (La.App. 2d Cir.1990); Perkins v. Certa, 469 So.2d 359, 361 (La.App. 2d Cir.1985).
A plaintiff is said to be the aggressor when he is at fault in provoking the altercation in which he was injured. The question of which party is the aggressor must be decided on the peculiar facts and *918 circumstances of each situation. Perkins v. Certa, supra.
Even when another party is the initial aggressor, the victim may use only so much force as is reasonably necessary to repel the attack and if the victim goes beyond that point, he is liable for damages. In determining the amount of force which is justified in repelling an attack, all facts and circumstances at the scene of the incident must be considered. Red v. Taravella, 530 So.2d 1186, 1190 (La.App. 2d Cir.1988).
Generally, one is not justified in using a dangerous weapon in self-defense if the attacking party is not armed but only commits battery with his fists or in some manner not inherently dangerous to life. However, resort to dangerous weapons to repel an attack may be justifiable in certain cases when the fear of danger of the person attacked is genuine and founded on facts likely to produce similar emotions in reasonable men. Under this rule, it is only necessary that the actor have grounds which would lead a reasonable man to believe that the employment of a dangerous weapon is necessary, and that he actually so believes. All facts and circumstances must be taken into account to determine the reasonableness of the actor's belief, but detached reflections or a pause for consideration cannot be demanded under circumstances which by their nature require split second decisions. Various factors relied upon by the courts to determine the reasonableness of the actions of the party being attacked are the character and reputation of the attacker, the belligerence of the attacker, a large difference in size and strength between the parties, an overt act by the attacker, threats of serious bodily harm, and the impossibility of a peaceful retreat. Levesque v. Saba, 402 So.2d 266, 270 (La.App. 4th Cir.1981).
In the instant case, McDonald testified that he believed that Slayton had beaten up people larger than himself, and, in essence, was capable of giving McDonald a beating as well; Slayton admitted that he had been in two fights while attending junior high school but gave no details of those altercations. Moreover, Slayton exhibited marked belligerence by refusing to leave McDonald's home despite repeated demands by McDonald while the latter was on the telephone with law enforcement authorities and was armed with a loaded twelve-gauge shotgun. This combination of reputation and belligerence evidence provides support for the trial court's conclusion that "the presence of the shotgun and defendant's threats were insufficient to thwart plaintiff's advances." It is undisputed that Slayton was considerably physically larger than McDonald, and the trial court accepted McDonald's testimony that Slayton had threatened to harm him. Indeed, Slayton himself admitted that he told McDonald that if McDonald shot him, he was going to get up and beat McDonald.
The trial court's finding that McDonald shot Slayton "to stop the plaintiff's advance" is a decision based upon the court's judgment of the credibility of the witnesses. Although both Slayton and his sister contradicted McDonald's testimony that Slayton was advancing when he was shot, Slayton's testimony that he was kneeling down when he was shot is contradicted by that of his sister and McDonald. Additionally, Slayton's testimony that he never came more than two feet into the house is contradicted by A.S. McDonald's testimony that he found blood about ten feet inside his home. Finally, the 911 tape, on which Slayton's voice became clearly audible only seconds before McDonald shot him, is further support for the conclusion that Slayton was advancing upon McDonald when shot. From its reasons for judgment, it is apparent that the trial court chose to credit McDonald's version of events over Slayton's version. Because the record supports this decision, it will not be disturbed on appeal.
Finally, it is evident that McDonald was simply unable to retreat from the encounter. While retreat is not a condition precedent for a finding of self-defense using justifiable force, in our opinion, the retreat of a lawful occupant of a home into a position in his home from which he cannot escape an attacker except by the use of force is strong evidence that the occupant's use of force to prevent the attack is proper. Although a shotgun may be a deadly weapon, McDonald used the gun in a way that he calculated *919 would stop the attack without fatally injuring Slayton. Further, as recited above, McDonald testified that he was "afraid that if he [Slayton] came past the gun that he was crazy enough to kill me." Under these circumstances, where McDonald was on the telephone with law enforcement authorities and had repeatedly demanded that Slayton leave, and Slayton continued to advance and threaten McDonald, we cannot disagree with the trial court's conclusion that McDonald used reasonable force to repel Slayton's attack.
Plaintiff also assigns as error the trial court's assessment to him of the court costs of defendant's unsuccessful reconventional demand as well as costs of his own lawsuit. LSA-C.C.P. Art. 1920 gives the trial court great, but not unlimited discretion in assessing costs. Donavan v. Jones, 26,883 (La.App. 2d Cir. 6/21/95), 658 So.2d 755, 768, writ denied, 95-1786 (La. 11/03/95), 661 So.2d 1379. As a general rule, the party cast in judgment is assessed the costs of the litigation. Bingham v. St. Paul Insurance Company, 503 So.2d 1043, 1046 (La.App. 2d Cir. 1987). However, having found that this incident arose due entirely to the fault of plaintiff's son, the trial court did not abuse its discretion in assessing all costs to plaintiff.

CONCLUSION
For the foregoing reasons, we conclude that the trial court was not clearly wrong in its findings that plaintiff's son was the aggressor in this incident, that defendant's son did not use unreasonable force in repelling plaintiff's son, and thus, that plaintiff was not entitled to recover damages. We further conclude that the trial court did not abuse its discretion in assessing all court costs to plaintiff. Accordingly, the trial court's judgment is affirmed at plaintiff's cost.
AFFIRMED.

APPENDIX
RH: 911, what is your emergency?
A: Ah, there's a trespasser in my house.
RH: A trespasser?
A: Well, never mind.
RH: Is there_____
A: I think his leaving.
RH: Okay
A: Okay, I'm sorry about that, okay, well no, no he's here.
RH: Who is it?
A: 120 Cardinal Hill.
RH: Whose the guy there?
A: JAMES SLATON.
RH: What's he doing?
A: He's coming in my house and I got a shotgun in my hand.
RH: 120 Cardinal Hill Road? Where's Cardinal Hill Road? Where Cardinal Hill Road?
A: Go ahead and go on home.
RH: Do what?
A: It's in Pea Ridge.
RH: Pea Ridge?
A: Off eight, twenty-two.
RH: Okay, what's his problem?
A: I don't know. He threw a piece of paper at me on the school bus and now he's in my house.
RH: He's in your house?
A: He's standing right in front of me.
RH: Hold on just a second. Okay.
A: Okay. (inaudible). Go, get your foot out of my house or you won't have a foot to get out of my house. Go and get out of my house. The cops are on the phone right here.
RH: You still there?
A: Yeah he's still in here.
RH: He's still in there.
A: Yeah, the only thing holding him back is ____
RH: How old are you?
A: I'm fourteen.
RH: How old is he?
A: I think he's like sixteen. He's alot bigger than me and he's in my house.
RH: He's in your house? Is there anyone else there?
A: Yes. Huh?
RH: Is anyone else there?
A: No, just me.
*920 RH: Okay, hold on just a second okay?
A: Okay.
(pause)
A: Go and go home. Now, go on home man.
JS: (inaudible)
A: Yeah, you're in my house.
(Pause)
A: Don't take another step towards me.
RH: Okay, what's your name?
A: DANIEL MCDONALD.
RH: DANIEL MCDONALD?
A: Yes.
RH: Okay, where exactly do you live?
A: You go down Farmerville Highway, you go down eight, twenty-two and it will be the second road on the right.
RH: Second road on the right?
A: Yeah and then you take the first road on the right once you go down there ____
RH: Ah, huh.
A: It'll be the first driveway on the right.
RH: First driveway on the right?
A: Yes.
RH: Okay.
A: He's standing here telling me to shoot him.
RH: On eight, twenty-two, take a right I think and then you turn on Cardinal Hill.
A: Yeah.
RH: Okay. Do you come in on Virgil Road or the other little road, off Rock Corner Road?
A: You come in off Cardinal Hill. You go down Virgil
RH: Ah, huh. It comes off of Virgil?
A: Yeah it comes off of Virgil.
RH: Ah, huh. How far down?
A: Ah, not real far.
RH: On the left or the right?
A: It's on the right. The road is on the right. Cardinal Hill will be the first diveway on that road.
RH: First Driveway on Cardinal Hill?
A: Yeah.
RH: Okay, hold on just a second.
A: Huh?
RH: Hold on just a second okay?
A: Well he, if he comes towards me I'm gonna have to shoot him.
RH: Hold on just a second okay. Calm down.
A: And he's over here saying that he's gonna get up and get me after that, but I
RH: Okay ____
A: ain't got but squirrel shot in here, but ____
RH: Hold on just a second okay?
A: Okay.
(pause)
RH: On the left?
A: On the right.
RH: You live on ____
A: Yeah.
RH: When you turn off of Virgil onto Cardinal Hill, do you live on the left or the right?
A: The right.
RH: On the right?
A: Yeah.
RH: Okay, hold on.
A: Yeah I can, because your in my house and I'm pressing charges on you too.
RH: Did he breakin?
A: Yeah, I told him, I told him to get off my land and not to come up here or I would press charges and then I was calling the police and now he's in my house, standing in the doorway.
RH: He's in your house. What's his name?
A: JAMES SLATON.
RH: JAMES SLATON, has he been drinking or anything?
A: No he's kinda crazy I think. I don't know, but see, he threw a piece of paper at me on the bus ____
RH: Ah, huh.
A: And so I threw it back at him and now he decides to come up here and come in my house.
RH: Okay, my deputies are enroute up there.
A: You move your foot around and come toward me, I'm gonna shoot you.
*921 JS: (inaudible)
A: I can hit a running target, yeah.
JS: (inaudible)
A: I'm positive. I am positive.
RH: DANIEL where are your parents at?
A: They're not here right now.
RH: Their at work?
A: Ah, huh.
RH: Okay what's your Dad's name?
A: TREY MCDONALD, work at UNR Sink Plant.
JS: (inaudible)
A: You better get out of my house.
JS: (inaudible)
A: If I have to shoot you I will.
JS: (inaudible)
RH: DANIEL is your phone number two, five, one, nine, four two, zero?
A: Yes.
RH: Okay.
A: That's my phone number.
RH: That's your phone number?
A: Yes sir.
RH: You live a 120 Cardinal Hill Road?
A: Yes sir.
RH: Okay.
A: Well you need to tell them to hurry because if he keeps coming toward me I'm gonna shoot him.
RH: Okay.
A: I ain't gonna shoot him but in the leg.
RH: Okay.
A: But I have to defend myself. 120 Cardinal Hill is my address.
RH: 120 Cardinal Hill.
A: Yeah.
RH: Okay.
JS: (inaudible)
A: Put my stuff down! Put my stuff down! I'm fixing to shoot him. I swear.
RH: Don't shoot him.
A: I'm gonna have to.
RH: Don't shoot him.
A: Put my shit down right now.
RH: Don't shoot him. Okay.
A: If I have to.
JS: (inaudible)
A: I'm not gonna let him come over here. You keep pointing at your knee and I'm gonna shoot you damn knee boy!
JS: (inaudible) boy!
A: I'm gonna have to shoot him! It's in self defense. He's in my fuvking house! That is self defense. You better get out.
RH: DANIEL is anyone else there beside you and him?
A: His sister.
RH: His sister?
A: Yeah.
RH: How old is his sister?
A: I don't know.
RH: Is she older or younger?
A: She's younger than him.
RH: Okay.
A: She's young, she's like in fifth grade, in elementary school.
RH: Okay.
A: And he's in high school and I'm in junior high.
RH: Okay, where do you go to school?
A: Ruston Junior High.
RH: Ruston Junior High. Okay.
A: They gonna have to bring a stretcher too if you don't get out of my damn house! I might just count to three! You don't know that! I'm crazy man! You better leave!
JS: One, two, three. (gun fire)
JS: Oh, (inaudible)
RH: Did you shoot him? DANIEL? DANIEL?
JS: Oh God! Oh God! God! Help!
RH: Hello, Hello, Hello, Hello, DANIEL? Hello, DANIEL are you there? Hello. Hello, hello,