747 So.2d 720 (1999)
Ronald D. MINKLER, Plaintiff-Appellant,
v.
Gary CHUMLEY as the Parent And Legal Guardian of His Minor Son, Ethan Chumley, Defendant-Appellee.
No. 32,558-CA.
Court of Appeal of Louisiana, Second Circuit.
December 8, 1999.
*721 Rice & Kendig by William F. Kendig, Shreveport, Counsel for Appellant.
Daryl Gold, Shreveport, Counsel for Appellee
Before WILLIAMS, GASKINS & PEATROSS, JJ.
PEATROSS, J.
Plaintiff, Ronald D. Minkler, appeals a judgment dismissing his claims against Defendant, Gary Chumley, as parent and legal guardian of his minor son, Ethan Chumley. For the reasons stated herein, we reverse and render judgment in favor of Plaintiff.

FACTS
This suit arises out of a violent encounter between Plaintiff, the general manager of Southern Trace Country Club ("Southern Trace") in Shreveport, Louisiana, and then 16-year-old Ethan Chumley ("Ethan"), on the premises of Southern Trace. At the time of the incident, Ethan was an unemancipated minor who lived with his parents.
Southern Trace maintains the Azalea Grill as one of its restaurants for members. Payment for meals contemporaneously with service is not accepted at the Azalea Grill; rather, club members who eat at the restaurant sign a guest ticket at the time of service and each month receive an inclusive bill for their meals that month.
*722 In the summer of 1996, one of the club's members, Ron Atkinson, contacted Southern Trace concerning his monthly bill which indicated several charges ostensibly incurred by his son, David. David, however, had not signed the tickets or incurred the charges; and it was suspected that another person or persons had signed David's name. Southern Trace agreed to absorb those losses, and Mr. Atkinson requested that the club positively identify anyone signing David's name to a ticket. Mr. Atkinson informed Southern Trace that David would cooperate with this procedure and produce identification when requested.
On August 3, 1996, a Saturday afternoon, a group of approximately a dozen youths entered the Azalea Grill. The group had previously been asked to leave the pool area for being too disruptive. Ethan and four or five of the other youths sat at one table while the rest sat at other tables. A waiter took the order of the youths at Ethan's table, and Ethan signed the ticket, in the amount of $42.15, with the name "David Atkinson." The restaurant staff, having been alerted to the problem with the Atkinson account, contacted Plaintiff.
Plaintiff approached Ethan's table and asked the youths who among them was David Atkinson. Plaintiff testified that the youths replied, "None of us." Plaintiff then asked whether one of them had signed the ticket, and the youths told him, "No, it was two guys that had just left." At that point, Plaintiff spoke with his staff and learned that no one had left the restaurant and that Ethan was the one who had signed the ticket.
Plaintiff approached Ethan and told him that he had been identified as the signatory, whereupon Ethan admitted that he had signed the ticket. Plaintiff then asked Ethan if his name was David Atkinson, and Ethan stated that it was. When Plaintiff asked him why he had earlier denied being David Atkinson, Ethan said that it made no difference, that he was David Atkinson and that he could sign the ticket. Plaintiff then informed Ethan of the problems with the Atkinson account and the arrangement agreed to by David and his parents that he would cooperate and produce identification when signing for meals. At that point, Ethan told Plaintiff that he had no identification on his person.
Plaintiff then asked Ethan to discuss the matter in another area, and the two walked over to a foyer near the hostess stand where Barbara Johnson was also present. Plaintiff again explained to Ethan that he was expected to produce identification because of the problems with the Atkinson account and that when he did so, he could continue with his meal. Ethan responded with the excuse that approximately two weeks earlier he had been arrested for drunk driving in Texarkana and that the Texarkana police had taken his license. Plaintiff stated that Ethan then took out his wallet, "flashed" it open and shut and said, "See, I don't have one." Ethan denied having any other form of identification on his person.
Having no tangible identification available, Plaintiff then decided to call the Atkinsons to have them identify Ethan's voice as that of their son. Plaintiff requested the Atkinsons' telephone number from Ethan, who gave Plaintiff a telephone number he later admitted to having made up on the spot. Plaintiff received no answer when he called the telephone number Ethan had given him and, on having his staff retrieve the Atkinsons' telephone number from club records, discovered the two telephone numbers did not match. Plaintiff confronted Ethan with the discrepancy and explained that it was necessary for Ethan to identify himself before he could allow him to return to his friends. Plaintiff testified that, at that point, Ethan had made a number of comments concerning who he was, that his father had given him permission to sign tickets and that Plaintiff would not have a job by Monday if he did not leave him alone. Plaintiff *723 conceded that that might be the case, but he continued to try to obtain an identification because he was following the Atkinsons' instructions. Plaintiff offered to wait with Ethan upstairs in his office until he could reach the Atkinsons, to which, according to Plaintiff, Ethan responded:
"This is getting ridiculous. I am not waiting around for anything. I am who I say I am. You won't have a job Monday if you continue pushing this and I am leaving."
Ethan then turned to walk out of the restaurant.
With Ethan's back to him, Plaintiff saw that Ethan's wallet was of the breast pocket oblong type and protruded from Ethan's back left pants pocket one to two inches. Plaintiff said that, "in an attempt to ID him," he reached out and took the wallet. Ethan turned back and demanded the return of his wallet, and Plaintiff explained that he would return the wallet after looking through it for identification.
When Plaintiff turned to look at the wallet in a better light, his back was to Ethan. It was Plaintiffs testimony that Ethan suddenly charged him from behind and slammed him into a nearby wall. The impact was sufficient to cause a 36-inch long break in the sheetrock where Plaintiff struck the wall. Ethan then pinned Plaintiff against the wall and tried to reach around him to retrieve his wallet when another club employee, George Becker, who was off duty at the time, pulled Ethan off of Plaintiff. In the melee that followed, Mr. Becker was struck in the face by Ethan. The trio fell to the floor with Mr. Becker on the bottom and Ethan between him and Plaintiff. At that point, Ethan yelled for help from his friends, but Plaintiff warned them away. The police were summoned and Ethan agreed to calm down and remain at the scene.
When the police arrived, Ethan initially maintained that he was David Atkinson and perpetuated the lie about the loss of his license in a DWI stop. One of the officers was familiar with Ethan, however, and knew that he was not David Atkinson. Another member of the restaurant staff also recognized Ethan. It was not until he was confronted with his own name that Ethan admitted his identity.
At trial, it was stipulated that Ethan signed David Atkinson's name to the guest ticket. Ethan, however, denied that anyone asked him to remain at the club until his identification could be confirmed.
As a result of the encounter, Plaintiff suffered various facial bruises and soft tissue injuries, particularly to his neck. When his neck pain had not subsided within two to three weeks as Plaintiff expected, he sought medical treatment from his general practitioner, Dr. Marion Cash, who prescribed pain medication and directed him into a course of physical therapy. Plaintiff complained that the pain and stiffness kept him from his normal exercise and fitness activities, as well as disrupted his sleep. Plaintiff pursued the physical therapy until February or March 1997; but the neck pain persisted at the time of trial in October 1998, and sharply limited Plaintiffs ability to participate in activities he used to enjoy such as golf, swimming, water skiing, bike riding and triathalon competitions.
Plaintiff filed the instant suit on July 17, 1997, against Gary Chumley ("Defendant") to recover damages for his injuries. On August 4, 1997, Defendant answered the suit and brought a reconventional demand against Plaintiff for "injuries to [Ethan's] throat" and for embarrassment and humiliation caused to Defendant by the filing of Plaintiffs lawsuit. Defendant dismissed the reconventional demand prior to trial. After trial on the merits, the trial judge dismissed Plaintiffs claims against Defendant.

DISCUSSION

Liability
Plaintiff asserts as his first assignment of error the trial court's failure to *724 find that Defendant's minor son, Ethan, committed a battery upon him causing injuries and damages. Plaintiff asserts this is legal error. We agree.
La. C.C. art. 2315 provides:
Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it.
La. C.C. art. 2318 provides:
The father and the mother and, after the decease of either, the surviving parent, are responsible for the damage occasioned by their minor or unemancipated children, residing with them, or placed by them under the care of other persons, reserving to them recourse against those persons.
Battery is defined as an intentional offensive contact with another person. Caudle v. Betts, 512 So.2d 389 (La. 1987). In order to recover for a battery, a plaintiff must prove by a preponderance of the evidence that his damages resulted from an unprovoked attack by defendant. Baugh v. Redmond, 565 So.2d 953 (La. App. 2d Cir.1990). Louisiana's aggressor doctrine precludes tort recovery where the plaintiff acts in such a way as to provoke a reasonable person to use physical force in fear or anticipation of further injury at the hand of the aggressor plaintiff, unless the person retaliating has used excessive force to repel the aggression. Slayton v. McDonald, 29,257 (La.App.2d Cir.2/26/97), 690 So.2d 914; Baugh, supra. Where a defendant relies upon provocation as justification for a battery, as in the case sub judice, he must prove some conduct or action by plaintiff sufficient to provoke and arouse him to the point of physical retaliation. Slayton, supra; Baugh, supra.
In its reasons for judgment, the trial court found that the preponderance of the evidence established that Plaintiff was attempting to remove Ethan's wallet, not place him under "citizen's arrest" pursuant to La.C.Cr.P. art. 214 and 215. The trial court further opined that there was no evidence that Plaintiff obtained any identification from Ethan after taking his wallet, which lead the trial court to the conclusion that Ethan was telling the truth about not having sufficient identification on his person. According to the trial court, Ethan was only attempting to get his wallet back from Plaintiff and was justified in doing so.
We find that the trial court erred in its application of La.C.Cr.P. arts. 214 and 215 to the case sub judice. On this record, we do not find that Plaintiff was the aggressor in the altercation, but was merely acting pursuant to the provisions of the citizens' arrest statutes.
La.C.Cr.P. art. 214 provides:
A private person may make an arrest when the person arrested has committed a felony, whether in or out of his presence.
La.C.Cr.P. art. 215 provides, in part:
A. (1) A peace officer, merchant, or a specifically authorized employee or agent of a merchant, may use reasonable force to detain a person for questioning on the merchant's premises, for a length of time, not to exceed sixty minutes, unless it is reasonable under the circumstances that the person be detained longer, when he has reasonable cause to believe that the person has committed a theft of goods held for sale by the merchant, regardless of the actual value of the goods. The merchant or his employee or agent may also detain such a person for arrest by a peace officer. The detention shall not constitute an arrest.
La.C.Cr.P. art. 220 provides:
A person shall submit peaceably to a lawful arrest. The person making a lawful arrest may use reasonable force to effect the arrest and detention, and also to overcome any resistance or threatened resistance of the person being arrested or detained.
We have no doubt that Ethan was in the process of violating La. R.S. 21:21, a felony, when he attempted to leave the restaurant while maintaining his false assertion *725 of identity. La. R.S. 21:21 provides, in part:
A. No person shall:
(1) Obtain accommodations at any hotel, inn, boarding house or restaurant or procure food without paying therefor, with intent to defraud, except when credit is given by express agreement....
B. Whoever violates any provision of this Section shall be fined not more than five hundred dollars, or imprisoned, with or without hard labor, for not more than two years, or both.
Plaintiff was merely trying to detain Ethan as he is authorized to do.
At least one witness saw Ethan sign the guest ticket for food in the amount of $42.15; Ethan signed the guest ticket with a false name on an account on which he did not have authorization to sign; and Ethan lied about his identity when confronted. This evidence establishes a prima facie case of at least the attempted violation of La. R.S. 21:21.
In light of Ethan's actions, we find Plaintiff was justified in his attempts to detain and identify Ethan. Ethan testified that the wallet which he was carrying at the time of the incident was oblong in shape and protruded from his back pocket by one to two inches. In taking Ethan's wallet from his pocket, Plaintiff did not have to physically touch Ethan, an action that is hardly provocative under the circumstances. Liability for a battery depends upon the facts and circumstances of each case. Baugh, supra.
In Keys v. Sambo's Restaurant, Inc., 398 So.2d 1083 (La.1981), the supreme court affirmed the dismissal of a tort action by a non-paying patron against a restaurant and its manager who restrained the patron. After the patron finished eating his meal and part of the meal of an absent friend, the patron made no attempt to pay but, instead, started to exit the restaurant. The manager stopped the patron in the vestibule between the inside and outside sets of doors and demanded payment; the patron offered $5.00, an insufficient amount. When the manager again refused to allow the patron to leave, the patron attacked the manager, who promptly carried the patron into the restaurant and held the patron in the restroom until police arrived. In rejecting the patron's suit for false imprisonment and personal injuries, the court stated:
Plaintiff did, in fact, commit a felony, R.S. 21:21, which authorized a private person to make his arrest, C.Cr.P. art. 214. The defendant used only that force which was necessary to detain the plaintiff until the police arrived and which would insure the safety of the other customers and employees.
In the case sub judice, Plaintiff testified that, given the decorum promoted at Southern Trace and the Azalea Grill, it was his desire to handle the situation in the most discrete fashion. Plaintiff stated he only wanted to learn Ethan's identity while affording him the respect Plaintiff believed to be due a club member. Plaintiff's decision to keep Ethan's wallet rather than to physically detain him was an exercise in restraint under circumstances where the greater intrusion would have been legally justified. Accordingly, we find that Ethan is responsible for all of Plaintiff's damages and that the trial court erred in deciding otherwise.

Damages
On a finding that the trial court erred in its dismissal of Plaintiffs claim, the appellate court is empowered by La C.C.P. art. 2164 to render any judgment which is just, legal and proper. Hammons v. City of Tallulah, 30,091 (La. App.2d Cir.12/10/97), 705 So.2d 276; Beckham v. St. Paul Fire & Marine Ins., 614 So.2d 760 (La.App. 2d Cir.1993). This includes an award of damages when the trial court initially rejects a plaintiffs demands and where the record contains sufficient proof of damages. Id. By making the initial award of damages, an appellate court is not limited to either the highest or *726 the lowest amount of a reasonable range of awards which would have been affirmed on appeal; the appellate court's responsibility is to award an amount which is fair and just for damages supported by the record. Morris v. Owens-Illinois, Inc., 582 So.2d 1349 (La.App. 2d Cir.1991).
"Special damages" are those which can be fixed to a pecuniary certitude. Hollenbeck v. Oceaneering Intern., Inc., 96-0377 (La.App. 1st Cir.11/8/96), 685 So.2d 163. The record reflects that Plaintiff expended $2,593 in medical costs for treatment of his neck. In his deposition, Dr. Marion Cash, who treated Plaintiff for his neck injury, indicated that Plaintiff suffers from a degenerative disc disease. In his opinion, Plaintiff's disc disease was asymptomatic prior to the incident with Ethan, but was made symptomatic by the resulting trauma of the incident. Dr. Cash stated that Plaintiff had reached maximum medical benefit from the trauma, but will likely suffer neck pain as a result of the trauma for the "indefinite" future. Dr. Cash described the traumatic injury as "very similar" to a whiplash injury that heals slowly, but is one from which most people recover fully. Given Dr. Cash's testimony, we find an award of $2,593 in special damages is supported by the record.
General damages are those that may not be fixed with pecuniary exactitude. Such damages involve mental or physical pain or suffering, inconvenience, the loss of physical enjoyment or other losses of life or lifestyle that cannot be definitively measured in monetary terms. Wright v. Wal-Mart Stores, Inc., 31,764 (La.App.2d Cir.5/5/99), 737 So.2d 153. Plaintiff presented evidence that his neck injury caused a loss of enjoyment of recreational and exercise activities in which he once actively participated. Primarily, he is no longer able to compete in triathalons and his other activities, when pursued, are tempered by his pain. He further testified that the pain persisted at the time of trial and that it still interrupted his sleep and adversely influenced his mood.
We find, therefore, that an award of $8,000 is sufficient to compensate Plaintiff for his injuries and other factors compensable in general damages. Although Dr. Cash opined that most similar injuries resolve themselves over time, Plaintiff had suffered from the pain for more than two years at the time of trial; and the pain has adversely affected many areas of his life, including his mood. His previously very active lifestyle will be restricted until such time as the pain resolves. Compare Smith v. Midland Risk Ins. Co., 29,793 (La. App.2d Cir.9/24/97), 699 So.2d 1192 ($8,000 award for cervical muscle pain); Marie v. John Deere Ins. Co., 96-1288 (La.App. 1st Cir.3/27/97), 691 So.2d 1327 ($8,500 award for cervical and lumbar sprain); Rebstock v. Cheramie, 95-1388 (La.App. 1st Cir.2/23/96), 673 So.2d 618 ($6,000 award for cervical and lumbar strain); Lennard v. State Farm, 26,396 (La.App.2d Cir.1/25/95), 649 So.2d 1114 ($15,000 award for aggravation of bulging cervical disc condition); McAllister v. Champion Ins. Co., 602 So.2d 314 (La.App. 1st Cir.1992) ($7,500 award for soft tissue neck and back injuries).

CONCLUSION
For the foregoing reasons, the judgment of the trial court dismissing the suit of Plaintiff, Ronald D. Minkler, is reversed. Judgment is hereby rendered in favor of Plaintiff, Ronald D. Minkler, and against Defendant, Gary Chumley, as the parent and legal guardian of his minor son, Ethan Chumley, in the amount of $10,593 plus legal interest from date of judicial demand until paid. All costs associated with this appeal are assessed to Defendant, Gary Chumley.
REVERSED AND RENDERED.