691 So.2d 1327 (1997)
Sandra MARIE and Gustave Marie, II
v.
JOHN DEERE INSURANCE COMPANY, Terrebonne Seafood, Inc., and Derrick E. Williams.
Jennifer MARIE and Gustave Marie, III
v.
JOHN DEERE INSURANCE COMPANY, Terrebonne Seafood, Inc., and Derrick E. Williams.
No. 96 CA 1288.
Court of Appeal of Louisiana, First Circuit.
March 27, 1997.
*1329 David J. Shea, Houma, for Plaintiffs-Appellees-Appellants.
Randall L. Kleinman, New Orleans, for Defendants-Appellants-Appellees.
Before SHORTESS, KUHN and FITZSIMMONS, JJ.
SHORTESS, Judge.
On March 31, 1995, an eighteen-wheel truck owned by Terrebonne Seafood, Inc. (Terrebonne), and operated by Derrick E. Williams, Terrebonne's employee, struck a pickup truck owned by Gustave A. Marie, III (GM III), and operated by his wife, Jennifer M. Marie (JM). The accident occurred on Louisiana Highway 56 in Terrebonne Parish between Chauvin and Houma near the Dream Come True Bridge.
GM III and JM sued Williams, Terrebonne, and their insurer, John Deere Insurance Company (Deere), hereafter referred to collectively as "defendants," for JM's personal injuries, GM III's loss of consortium, property damage to the pickup, and penalties and attorney fees under Louisiana Revised Statutes 22:658 and 22:1220. JM's mother-in-law, Sandra A. Marie (SM), was a passenger in the pickup at the time of the accident. She and her husband, Gustave A. Marie, Jr. (GM),[1] sued defendants in a separate suit for SM's personal injuries and GM's loss of consortium. JM, GM III, SM, and GM are collectively referred to herein as "plaintiffs."
The cases were consolidated for all purposes, and after a bench trial, the trial court gave oral reasons in which it found Williams' negligence was the sole cause of the accident. However, the court rejected GM III's claims for penalties and attorney fees. The court rendered a single judgment in favor of all four plaintiffs on the personal injury, loss of consortium, and property damage claims.[2] Defendants appealed the issues of liability and quantum as to all plaintiffs. Plaintiffs answered the appeal. JM and SM seek larger *1330 damage awards, and GM seeks penalties and attorney fees.

LIABILITY
Defendants contend the trial court was manifestly erroneous in finding Williams was the sole cause of the accident. A cause-in-fact determination is one of fact; appellate courts must accord great deference to the trial court's findings. Cay v. State, 93-0887, p. 8 (La.1/14/94), 631 So.2d 393, 398; Spiller v. State, 95-1282, p. 8 (La.App. 1st Cir. 2/23/96), 668 So.2d 1318, 1323, writ denied, 96-0691 (La.4/26/96), 672 So.2d 910. This factual finding may be reversed only if the trial court is manifestly erroneous. Theriot v. Lasseigne, 93-2661, p. 5 (La.7/5/94), 640 So.2d 1305, 1310.
The standard of appellate review of factual findings is a two-part test: 1) the appellate court must find from the record there is a reasonable factual basis for the findings of the trial court, and 2) the appellate court must further determine the record establishes the findings are not clearly wrong (manifestly erroneous). Mart v. Hill, 505 So.2d 1120, 1127 (La.1987). If the trial court's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse. Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La. 1990). Consequently, when there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Housley v. Cerise, 579 So.2d 973, 976 (La.1991); Sistler, 558 So.2d at 1112.
Our review of this record reveals the following facts. The parties stipulated Williams was in the course and scope of his employment with Terrebonne at the time of the accident. It is undisputed the accident occurred as Williams attempted to pass both a stalled Jeep and a pickup truck and then immediately make a "buttonhook," or wide right turn. The right rear of the eighteenwheeler's trailer struck the left rear corner of the pickup. The real dispute at trial was whether JM contributed to the accident in any way by backing into the eighteen-wheeler or by failing to take evasive action.
Jimmy A. Lirette was northbound on Highway 56 between Chauvin and Houma in Terrebonne Parish. When a left-turning motorist ahead of him forced him to stop suddenly, his Jeep's engine stalled. He stepped partially out of the Jeep, tried to push the vehicle, and realized he could not because he was in a banked curve. Within thirty seconds after his engine stalled, a pickup truck stopped eight to ten feet behind him. He turned toward the pickup, threw his hands in the air, got back into the Jeep, and tried to start the engine again.
Lirette testified he then heard a horn blow, saw the eighteen-wheeler approaching, and saw the pickup move closer to his Jeep. The big truck was attempting to pass them both and make a wide right turn around them. The pickup was stopped three to five feet behind his Jeep when the big truck struck the pickup. Lirette stated the pickup never backed up. In his opinion, there was nothing JM, the pickup driver, could have done to avoid the accident.
JM testified she was driving SM to work the morning of March 31, 1995, when they had to stop behind Lirette's stalled jeep. She thought about passing the jeep on the left but could not do so because of oncoming traffic. She had room to pass the Jeep on the right shoulder of the road but stated she would not have done so because "you're not supposed to." She had been stopped less than a minute when SM said, "He's not going to make it." She looked back, saw the eighteen-wheeler, turned and grabbed the steering wheel, and then felt a jolt as the big truck hit the pickup. She testified she never saw or heard the eighteen-wheeler before SM warned her of the collision, and by then she did not have time to take evasive action.
JM was not sure how far behind the Jeep she was when she stopped, but she denied moving forward or backward after her initial stop. She stated the truck had a standard transmission, and she had her foot on the brake at the time of impact.
SM, the passenger in the pickup, testified the Jeep was stalled just before a stop sign. She saw the Jeep's driver start to get out and then throw his arms in the air. She heard a noise, turned to look over her left *1331 shoulder, and saw the truck attempting to pass them. She yelled to JM, placed a hand on the dashboard, and turned her body so she could watch the truck. When the eighteen-wheeler hit the pickup, she felt a "big jolt." Her whole body flew forward, stopping an inch or two from the dashboard.
Williams testified that as he came over the Dream Come True Bridge, he noticed three vehicles stopped at the stop sign. He needed to turn right at the stop sign. He saw the first vehicle wait for oncoming traffic to clear and then turn left. He saw the Jeep and the pickup behind it and noticed the Jeep driver get out, put his hands in the air, and get back in the Jeep. He concluded the two vehicles had been in a minor "fender-bender" and decided to make an "extra wide swing" around them as he made the turn. When he first looked in his right-hand mirror the pickup could not be seen. But when he looked again, he saw the pickup and immediately stopped, blocking all of Highway 56.
Williams stated there was no oncoming traffic, and he would not have made the turn if he had thought he would hit the pickup. When he got to the stop sign, the pickup was three to four feet from the Jeep. He never saw the pickup move backward but believed it must have moved forward at some point.
The trial court found the evidence did not support the defense theory that JM backed into the eighteen-wheeler. We agree. There is not a scintilla of evidence to substantiate that theory. As the trial court noted, even Williams did not testify that the pickup moved backward.
The trial court also gave no credence to the defense theory that JM should have taken evasive action, stating:
And I think the second line of defense was that she could have pulled around the shoulder of the road and passed Mr. Lirette on the right which would have been a violation of our state law and surely would not be something that a prudent driver would have done.
A prudent driver would have done as [JM] did, stop and wait for Mr. Lirette to clear the highway or stop and pass him when she could.
Defendants contend JM's testimony that she never saw or heard the eighteen-wheeler before SM yelled to her is "completely lacking in credibility." They further contend that if she did not hear the truck, she was at fault for being inattentive. The trial court saw and heard the witnesses and found JM's testimony credible. We must give deference to that finding. Furthermore, even if she had heard the big truck, there is no evidence that she had time to take evasive action or that she should have suspected the truck would attempt to make a passing/right-turning maneuver.
The trial court's findings are supported by the law and evidence and are not manifestly erroneous. We affirm the trial court's finding that Williams' fault was the sole cause of the accident.

QUANTUM
Defendants contend the general damages awarded each of the four plaintiffs are excessive. JM and SM contend the damages awarded to them are inadequate. The correct standard for appellate review of a damage award is clear abuse of discretion. Theriot v. Allstate Ins. Co., 625 So.2d 1337, 1340 (La.1993). That discretion is vast and should rarely be disturbed unless it is, in either direction, beyond that which a reasonable trier of fact could assess under the particular circumstances. Hae Woo Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La. 1993), cert. denied, 93-933 (U.S.2/22/94), 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379.

Sandra A. Marie
The trial court awarded SM a total of $20,750.00 in general damages.[3] The court explained how it arrived at this figure:
I calculate something like ten months of pain and suffering. I thought [the first five] months were the most severe and for *1332 five months I would allocate $7,500 for that pain and suffering; for four months $3,000; for one month $250; that will be $10,750 with a five percent disability as testified to by Dr. Kinnard because of the condition. I estimate that's worth approximately $10,000.
Defendants contend the trial court abused its discretion in making an award for permanent disability. They argue Dr. William Kinnard's finding that SM has a five-percent permanent disability is "contrary to all of the medical evidence." SM does not seriously argue her general damages were abusively low. In plaintiffs' appellate brief, counsel states: "Taken as a whole, the award of $20,750 is clearly reasonable. If anything, the award is low compared with other reported cases."
The evidence regarding SM's injury and treatment is as follows. SM testified that immediately after the accident her arm "started feeling funny" and she noticed a lump from a swollen muscle on her right shoulder. She refused assistance from a passing ambulance at the scene. Four days after the accident, on April 3, 1995, she saw Dr. William St. Martin, a family practitioner, who diagnosed cervical strain and prescribed Vicodin and Valium. She saw St. Martin again on April 10, 1995. On that visit he diagnosed cervical and lumbar strain and prescribed Robaxin and Naprosyn. She last saw St. Martin on April 19, 1995, when he again diagnosed cervical and lumbar strain and referred her to Dr. William Kinnard, an orthopedist.
Kinnard saw her a week later. His diagnosis was the same as St. Martin's. She did not return to Kinnard until October 12, 1995. In the meantime she began treatment with Glynn D. Manceaux, a chiropractor and physical therapist. Manceaux treated her conservatively from May 1, 1995, through January 15, 1996. His diagnosis as of October 1995 was "chronic spinal sprain strain syndrome." Manceaux testified sixty-five percent of his total care to SM was rendered between May and August 1995. After that, he saw her on an as-needed basis. Based on the history given by SM and his clinical findings, he believed her back and neck problems were related to the accident.
Kinnard testified that when he saw SM in October 1995, she told him she was getting chiropractic care, which was helping her. She also told him she had quit her job six weeks earlier, which had improved her symptoms. He advised her to continue seeing Manceaux. He also reviewed the MRI's of her back and neck which were taken in July 1995. Her neck appeared normal, but the MRI showed a disk protrusion at the L5-SI level. The disk was not impinging on a nerve, but Kinnard stated it could still cause pain, typically in the buttocks and posterior thigh area, and that SM's complaints of buttock and thigh pain were consistent with this type of disk abnormality. Kinnard further stated this type of abnormality was more typically caused by trauma than by degeneration.
SM returned to Kinnard in January 1996 complaining of increased symptoms. Her main complaint was her low back. He found mild spasm with tenderness in her low back and recommended an EMG, which was normal.
On February 5, 1996, ten days before the trial, SM underwent an epidural steroid injection. The day before the trial she reported to Kinnard she had gotten a fair amount of relief from that procedure and was pleased with the result, although she still had some cramping of the left buttock. Kinnard stated she now has three options: 1) continued conservative treatment, 2) up to two more steroid injections, or 3) surgery. He described surgery as a "probability" but noted whether she would need surgery depended on how she responded to the injections.
Kinnard assigned a five-percent disability of the body as a whole to SM based on the restrictions he placed on her, i.e., lifting no more than twenty to twenty-five pounds on a regular basis, avoiding repetitive bending and repetitive heavy pushing and pulling, and, ideally, alternating sitting, standing, and walking with two-hour maximum intervals. He stated this would "pretty much restrict [her] to light to perhaps light medium work situations."
*1333 Dr. Robert A. Steiner, defendants' expert orthopedist, examined SM once, on November 17, 1995, over seven months after the accident. Although he testified he had reviewed SM's medical records, he stated he had no proof she had actually sustained an injury. He opined that if she had sustained a soft-tissue injury, she should have responded to conservative treatment within six weeks to three months.
Defendants' contention that the trial court erred in awarding SM damages for permanent disability ignores Kinnard's testimony and the trial court's express findings rejecting Steiner's opinion. The court stated that Steiner, "like most good independent medical examiners," found nothing wrong with SM, but the testimony of the other physicians did not bear out Steiner's position. We find no error in the trial court giving more credence to the testimony of SM's treating specialist than to a consulting physician who examined her one time, more than seven months after the accident, for litigation purposes.[4]
We find no merit to either SM's or defendants' contentions that the trial court abused its discretion in awarding general damages to SM. While, in our opinion, the award is on the low side, it is not an abuse of the trial court's much discretion. We thus affirm the award of general damages to SM.

Jennifer M. Marie
The trial court awarded JM $8,500.00 for general damages. It calculated this award as follows:
With regards to J[M], I conclude from the testimony of Dr. Manceaux that she had four months when she apparently was under serious active medical treatment; I award $6,000 for that, two months of semiactive I give her $1500, four months of less than that and I'd give her ... $1,000, total of $8,500 for her pain and suffering.
JM testified she began to hurt the night of the accident. Her neck, arms, and back ached. Three days after the accident she went to St. Martin, complaining of neck and back pain. St. Martin diagnosed cervical strain. She returned on March 10, 1995, one week later. She reported her neck was feeling better and she had no headache or spasm.
On April 24, 1995, JM began seeing Manceaux. She complained of neck and low back pain. Manceaux found spasm in her neck and shoulders and limited range of motion in her neck and thoracic spine. He diagnosed cervical and lumbar sprain/strain. On May 17 she had improved but still complained of neck and low back pain and suboccipital headaches. These problems were less severe by June 7.
Manceaux testified the majority of his treatment of JM was during the first four to five months following the accident. By September he was seeing her on an as-needed basis. He saw her three times in September, four times in October, five times in November, three times in December, and twice in January. He noted minor spasm in October, which was "very minimal" by November 6. When he saw her on January 22, 1996, three weeks before the trial, she was doing "quite well" and had only occasional neck and low back pain. He stated her treatment and recovery were "ideal."
Steiner examined JM at defendants' request on November 17, 1995. He found no objective evidence she had ever been involved in a traumatic injury. He opined that even if she had sustained an injury as claimed, her injuries should have healed in eight weeks, and no treatment was needed after that point.
Relying on Steiner's opinion, defendants contend the trial court abused its discretion in awarding $8,500.00 to JM because her "injuries could not have been symptomatic for more than six weeks to three months." As stated above, the trial court rejected Steiner's opinion. Manceaux, who treated *1334 JM, found objective symptoms, though minimal, as late as November 6, 1995, over seven months after the accident. We find no error in the trial court's reliance on the actual observations of Manceaux, JM's treating chiropractor and physical therapist, rather than the speculations of Steiner. The trial court's award is supported by the evidence, and we find no abuse of discretion.

Gustave Marie, Jr.
The trial court awarded GM $2,000.00 for loss of consortium with SM. Defendants contend this award is "unconscionably high" because there was no specific testimony regarding the number of times in which the parties engaged in marital relations before and after the accident and the couple did not request help from a priest, social worker, or psychiatrist for marital difficulties.
In reviewing an award for loss of consortium, it is necessary to evaluate the elements which comprise a loss of consortium claim. "Consortium" means much more than sexual relations. The term also includes love and affection, society and companionship, support, aid and assistance, felicity, and performance of material services, e.g., uncompensated work around the home. Brungart v. K Mart Corp., 95-0708, p. 9 (La.App. 1st Cir. 2/23/96), 668 So.2d 1335, 1341, writ denied, 96-0763 (La.5/3/96), 672 So.2d 686.
GM testified that before the accident, he and SM went dancing and fishing together, and she cut the grass and tended the yard. They no longer go dancing or fishing, and she no longer mows or does yard work. He also testified the frequency and quality of their sexual relations has definitely decreased, and she would "get aggravated a lot" and "start fussing" at him "for no reason at all." SM described the change in their sexual relationship as follows: "It's been a lot less frequent, it's not what it used to be. If I didn't have to, I wouldn't."
This evidence was more than sufficient to support a $2,000.00 award for loss of consortium. We find no abuse of the trial court's vast discretion.

Gustave Marie, III
The trial court awarded GM III $500.00 for loss of consortium. Defendants contend he should have received nothing because his wife, JM, testified their relationship had not changed since the accident. GM III works offshore twenty days per month. When asked if the accident had altered their relationship, JM stated, "No, sir, my husband's never home."
Although JM believed their relationship had not changed, GM III testified he had noticed a change in JM since the accident. He stated she complained "a lot" about headaches and backaches. In making the $500.00 loss of consortium award, the trial court stated: "[I]t's an awful difficult area for me to place a number but that seems like a fair amount for the testimony that he's given to the Court." (Emphasis added.)
Whether GM III suffered a loss of consortium with JM is a factual question. We cannot say the trial court was manifestly erroneous in concluding, based on GM III's testimony, that there was an impairment of the society and companionship between JM and GM III caused by JM's injuries. Although the testimony was brief, it supported the minimal award made by the trial court.

DAMAGES UNDER LA. R.S. 22:658 AND 22:1220
The trial court found GM III was entitled to $1,292.07 for damages to his pickup. The property damage had not been paid, nor had the truck been repaired, as of the date of trial. GM III contends the trial court erred in denying his claims under Revised Statutes 22:658 and 22:1220 for damages, penalties, costs, and attorney fees against Deere.

Claim under La. R.S. 22:658
Revised Statute 22:658(A)(4) provides: "All insurers shall make a written offer to settle any property damage claim within thirty days after receipt of satisfactory proofs of loss of that claim." The arbitrary and capricious failure to do so subjects an insurer to penalties and attorney fees. La. R.S. 22:658(B)(1). The trial court did not discuss *1335 GM III's claim under this statute but awarded no penalties or attorney fees.
This court has held that the penalty provisions of Revised Statute 22:658(B) are inapplicable to third party claimants such as GM III.[5]Nettleton v. Audubon Ins. Co., 93-1576 (La.App. 1st Cir. 5/20/94), 637 So.2d 792, 795-96.[6] Thus, the trial court did not err when it awarded no damages to GM III under that statute.[7]

Claim under La. R.S. 22:1220
GM III contends the trial court erred in denying his claim under Revised Statute 22:1220(A), which provides:
An insurer ... owes to his insured a duty of good faith and fair dealing. The insurer has an affirmative duty to adjust claims fairly and promptly and to make a reasonable effort to settle claims with the insured or the claimant, or both. Any insurer who breaches these duties shall be liable for any damages sustained as a result of the breach.
The trial court rejected GM III's claim under this statute because he failed to prove he had sustained any damage as a result of Deere's failure to pay the property damage claim. When asked, "Have you suffered any damage because you have not been able to use a truck," GM III answered, "No." This decision was legally correct under this court's interpretation of Revised Statute 22:1220 at the time the judgment was rendered. See Carter v. Davis, 95-2198, p. 4 (La.App. 1st Cir. 5/10/96), 673 So.2d 362, 365; Graves v. Businelle Towing Corp., 95-1999, p. 6 (La.App. 1st Cir. 4/30/96), 673 So.2d 311, 315.
Since then, however, the interpretation of Revised Statute 22:1220 has been in a state of flux. The Louisiana Supreme Court in Theriot v. Midland Risk Insurance Company, 95-2895 (La.11/14/96), 683 So.2d 681, attempted to answer three of the questions regarding that statute which had divided the appellate circuits(1) whether it applied to third-party claimants (yes), (2) whether the list in subsection B of five acts that constitute breaches of subsection A are exclusive (no), (3) and whether penalties can be awarded when the only damages are noneconomic (yes). Justice Marcus, in a dissent, interpreted the majority's answer to the last question to mean a claimant may recover damages under Revised Statute 22:1220 without proof of general or special damages. The issues are even more unsettled now, however, because on December 13, 1996, the supreme court granted the insurer's application for rehearing.
If the supreme court changes the answers to any one of the three questions on rehearing, GM III would lose. He is a third-party claimant, the breach he claims is not enumerated in subsection B, and he had no actual damages. We need not wait for the supreme court's ultimate determination in Theriot, however, because we conclude, based on the record before us, that GM III failed to prove his entitlement to damages under Revised Statute 22:1220. Even if the supreme court's interpretation of Theriot remains the same, *1336 the claimant has the burden of proving the insurer acted unreasonably in its settlement negotiations. Theriot, 95-2895 at p. 13, 683 So.2d at 688. GM III provided the trial court with almost no evidence of settlement negotiations, and certainly not enough for the court to conclude the insurer acted unreasonably. GM III's only testimony regarding this issue is that Deere offered to pay half the property damage. The record does not reflect when this offer was made, by whom, or under what circumstances. Based on this evidence, we find GM III failed to carry his burden of proof that he is entitled to damages under this penal statute.

CONCLUSION
For the foregoing reasons, the judgment of the trial court is affirmed in all respects. Defendants are cast for all costs.
AFFIRMED.
KUHN, J., dissents only insofar as the general damage award for Sandra Marie. The trial court acknowledges that a 5% disability exists and awards $10,000.00. THE AWARD IS ABUSIVELY LOW.
NOTES
[1] GM is referred to in the caption as "Gustave Marie, II," but he testified his name is "Gustave Marie, Jr."
[2] These consolidated cases were treated as one for all purposes in the lower court and were appealed jointly. The proper procedure was to appeal the cases separately. Since they were submitted for decision jointly, however, we shall treat them as one herein.
[3] The trial court stated in oral reasons he was awarding SM $27,750.00, but the judgment awards her $20,750.00. It is clear from the transcript the figure in the judgment was what the trial court intended.
[4] The diagnosis and opinions of a plaintiff's treating physician and the specialists to whom plaintiff was referred by his treating physician are entitled to more weight in a personal injury action than those of doctors examining the plaintiff only for litigation purposes. Orgeron v. Prescott, 93-926, pp. 10-11 (La.App. 5th Cir. 4/14/94), 636 So.2d 1033, 1041, writ denied, 94-1895 (La.10/28/94), 644 So.2d 654; Wells v. Allstate Ins. Co., 510 So.2d 763, 767 (La.App. 1st Cir.), writ denied, 514 So.2d 463 (La.1987).
[5] The only exceptions are third party claimants who have reached written agreements of settlement for property damage and medical expense claims. See La. R.S. 22:658(A)(2).
[6] The third, fourth, and fifth circuits are in accord. Payton v. Colar. 518 So.2d 1104, 1108 (La.App. 4th Cir.1987); Guillory v. Gulf South Beverages, 506 So.2d 181, 183 (La.App. 5th Cir. 1987); Roy v. Glaude, 494 So.2d 1243, 1245 (La.App. 3d Cir.1986).
[7] Even if the statute applied to third-party claimants, there is no evidence in this record that GM III ever submitted "satisfactory proofs of loss" as required by Revised Statute 22:658(A)(4). A satisfactory proof of loss is one which fully apprises the insurer of the claim. Hart v. Allstate Ins. Co., 437 So.2d 823, 828 (La.1983). The only evidence in the record which could be considered notification by GM III to Deere that its insured had damaged his truck (other that the petition instituting this lawsuit) was a letter from his counsel to Deere dated July 20, 1995, which states:

Jennifer Marie's vehicle was rear ended by your insured over three months ago. The vehicle still is not repaired. Louisiana's penalty statute contained in the Insurance Code will apply to John Deere Insurance for this delay in repairing the vehicle. Did your appraiser ever inspect the vehicle? What were the conclusions of the appraiser? Why has the vehicle not been repaired?
The letter contains no reference to the amount of the damage and does not reference or enclose an appraisal (although GM III testified he had the pickup appraised twice).