750 So.2d 460 (2000)
Remedios BASS, Plaintiff-Appellant,
v.
ALLSTATE INSURANCE COMPANY, et al., Defendants-Appellees.
No. 32,652-CA.
Court of Appeal of Louisiana, Second Circuit.
January 26, 2000.
*461 William E. Armstrong, Monroe, Counsel for Appellant.
Hudson, Potts & Bernstein by Mark J. Neal, Monroe, Counsel for Appellees.
Before BROWN, WILLIAMS and DREW, JJ.
DREW, J.
Remedios Bass, individually and on behalf of her four children (Alicia, Arthur, Christina and Christopher), filed suit alleging that they suffered injuries when the car in which they were riding was rearended by a sport utility vehicle. Following a bench trial, the court entered judgment in favor of Ms. Bass, Alicia, Christina and Christopher, awarding each expenses for one week of medical treatment and $250 in general damages for soft-tissue irritation and inconvenience. The court denied recovery for Arthur, concluding that he did not sustain any injuries as a result of the accident.
Ms. Bass appeals the judgment on behalf of herself and her children. We affirm.

FACTS
On August 13, 1997, Remedios Bass drove a 1988 Chevrolet Corsica automobile into the parking lot of Ouachita Parish High School. Her passengers were her children Alicia, Arthur, Christina and Christopher. Samuel Newman was driving his father's 1986 Ford Bronco about a one-half car length behind the Bass vehicle. As Newman turned into the lot, he glanced to his left to look at other cars. When Newman's attention returned to the path in front of his vehicle, he slammed on his brakes and struck the Bass vehicle. Newman estimated he was traveling between 5-10 m.p.h. before he applied his brakes. The Corsica was moving when it was struck because Ms. Bass had her foot on the accelerator at the time.
James Hunter, auto damage appraiser for Allstate Insurance, replaced the Corsica's trunk and repaired scuff marks on the outer cover of the rear bumper. These repairs cost $765.90, including parts and labor. The only damage to Newman's vehicle was a cracked plastic license plate holder on the front of the Bronco.

Alleged Injuries
Deputy Michael Judd of the Ouachita Parish Sheriffs Office investigated the accident. He recalled that Alicia told him that her back was sore, and that Christopher *462 told him he had a headache. No other occupant of the Corsica complained of injury. Deputy Judd did not observe physical injuries to any occupant.

Remedios Bass
Ms. Bass, who drove the Caprice, was 41 years old at the time of the accident. Describing the impact as hard, she testified that her body struck the vehicle's steering wheel. Ms. Bass alleged that her head, neck, back and both shoulders were injured in the accident. The day after the accident, August 14, 1997, Ms. Bass began treatment with chiropractor Dr. Scott Caldwell. She stopped treatment in September 1997, because she no longer had transportation to Dr. Caldwell's clinic.
Ms. Bass testified that: (i) she began having headaches the afternoon of the accident, and that these headaches lasted only a week; (ii) her back and shoulder injuries were the most painful; (iii) the pain in the back of her neck was constant, but had cleared up by the last time she went for treatment; (iv) the shoulder pain was not constant and had also cleared up by September 10; (v) she experienced a sharp pain in her lower back which resolved two weeks after her last treatment; and (vi) while her condition eventually improved, her injuries did not completely heal until two weeks after she stopped treatment on September 10.
Dr. Caldwell testified that Ms. Bass complained of headache, neck pain, trapezius pain and lower back pain when he first examined her on August 14. He noted muscle spasms in her upper parathoracic and paralumbar muscles during this initial examination. According to Dr. Caldwell, the detection of a muscle spasm is "an objective finding that has some subjective component as well." He believed that Ms. Bass's spasms were legitimate. Dr. Caldwell added that he normally does not note the existence of muscle spasms upon each subsequent visit. Cervical and lumbar x-rays showed a loss of the normal curve in Ms. Bass's neck, which is usually caused by a muscle spasm and is a very common finding in a car wreck injury.
Ms. Bass was treated by Dr. Caldwell 10 times between August 14 and September 10, 1997. Dr. Caldwell's initial diagnosis was acute strain/sprain of the cervical, thoracic and lumbar spine and both shoulders resulting from the accident. He classified Ms. Bass's injuries as moderate soft tissue injuries since she presented with muscle spasms in the upper thoracic and lumbar spine.
Therapy consisted of electrical stimulation, ultrasound, ice, heat and traction. While Ms. Bass's symptoms had gradually improved, on the date of her last visit to Dr. Caldwell, he noted she still had pain when moving her neck and lower back. Dr. Caldwell expected her to reach maximum medical improvement within three to four weeks of her last visit.
Because Dr. Caldwell wanted Ms. Bass to get medication, he referred her to Dr. Thomas Dansby, a physician who has a satellite office in the same medical building. Dr. Dansby examined Ms. Bass only once, on August 28, 1997. He did not note any muscle spasms during this examination, and he testified that he would generally make a notation if a muscle spasm was found. Ms. Bass told him her back was much better and her neck was markedly improved. His diagnosis was resolving cervical strain, and his recommended course of treatment was to continue physical therapy and begin taking an anti-inflammatory medication. Dr. Dansby testified that he continued therapy because Ms. Bass "still [had] some tenderness and was complaining with that so I felt like she did have a cervical strain even though the symptomatology had been subjectively improved by her history."

Alicia Bass
Alicia, 14 years old on the date of the accident, was seated in the back seat of the Corsica on the passenger side. She testified that upon impact, which she described as hard, she struck the seat in front of her. *463 Alicia complained to Deputy Judd after the accident that her back was hurting. Alicia testified that: (i) she experienced pain in the shoulders and lower and middle back; (ii) she considered her lower back injury to be the most painful and her shoulder injury the least painful; (iii) muscle spasms in her lower back created sharp pain which caused her to cry; (iv) she was unable to participate in PE at school; and (v) her injuries did not resolve until a little over two weeks after she was treated by Dr. Caldwell for the last time on September 10.
Alicia was treated by Dr. Caldwell 10 times between August 14 and September 10. According to Dr. Caldwell, Alicia reported pain in her left mid back and both sides of her lower back. He noted a spasm in the left upper shoulder and upper back muscles. His initial diagnosis was acute strain/sprain of the low back and mild strain of the mid back related to the accident. Dr. Caldwell classified Alicia's injuries as soft tissue injuries mainly involving the mid and low back, and which he considered to be mild to moderate due to some muscle spasm in the left upper trapezius muscle. Alicia was treated with electrical muscle stimulation, ultrasound, traction, ice and heat. Dr. Caldwell recalled that Alicia's lumbar spine was always her area of greatest pain and discomfort. He also recalled that at the time of her last visit, Alicia only had mild lower back pain with stiffness. Dr. Caldwell expected her injury to resolve in one to two weeks after this last visit.
Alicia was examined by Dr. Dansby on August 28, 1997. This was the only time he treated her. Alicia did not present with any signs of muscle spasm. Dr. Dansby's assessment of her condition was resolving lumbar strain as a result of the accident. He recommended that Alicia continue therapy and be rechecked in a few weeks.

Christina Bass
Christina, nine years old at the time of the accident, was seated behind her mother in the Corsica. Christina testified that upon impact, her body was thrown forward, then backward. She further testified that the impact caused her to hit her head and knee on a suitcase sitting in her lap. She alleged that her knee was bruised and bleeding, and is scarred as a result. Christina explained that besides injuring her head and knee, she also injured the back of her neck and left shoulder and received treatment of her lower back. She related that she was back to normal after finishing treatment on August 29.
Christina was first examined by Dr. Caldwell on August 14, and was treated by him seven times between that date and August 29. Dr. Caldwell recalled that Christina reported pain in her neck and in both legs. His diagnosis was acute strain/ sprain of the neck, right knee and upper left trapezius muscles. He classified her injury as a mild musculoskeletal injury secondary to trauma in the accident. He did not detect any muscle spasms.
Treatment by Dr. Caldwell included electrical stimulation, ultrasound and ice. Dr. Caldwell recalled that while Christina's condition had improved, she was still not free of pain on the last day of treatment. He estimated that she would recover in an additional one to three weeks. Dr. Caldwell commented that children are usually more resilient than adults in recovering from physical trauma.
Dr. Dansby examined Christina only one time, on August 28, 1997. He did not note any muscle spasms. Dr. Dansby testified that Christina told him that the physical therapy had helped, and that she had been going to school and playing at recess without any difficulty. Dr. Dansby felt that her injuries had essentially resolved by the date of his examination. He also felt that Christina would have made a complete recovery after one more day of therapy. Christina was treated by Dr. Caldwell the next day.

*464 Christopher Bass

Christopher, who was sitting in the middle of the back seat between Alicia and Christina, was 10 years old on the date of the accident. He alleged that he injured his head and his left big toe when he hit a suitcase. Christopher reported to Deputy Judd that his head hurt. Christopher testified that his head hurt for about a week, and that his toe bothered him for even less time. He also stated that he injured his neck and upper back in the accident. Christopher testified that he had completely recovered when he saw Dr. Caldwell for the last time.
Christopher received treatment from Dr. Caldwell seven times between August 14 and August 29. Christopher reported to Dr. Caldwell that he suffered from a headache, neck pain, low back pain and trapezius pain. He did not present with any muscle spasms during the examination. Dr. Caldwell's diagnosis was acute strain/sprain of the cervical and lumbar spine, left knee and left big toe, all of which he characterized as mild to moderate soft tissue injuries. The prescribed treatment was electrical muscle stimulation, ultrasound and ice. Dr. Caldwell expected Christopher's recovery period to last from two to four weeks after his final treatment.
Dr. Dansby examined Christopher on August 28, 1997. Christopher told Dr. Dansby that he had been doing well and that his only complaint was transient back pain. Christopher did not present with muscle spasms. Dr. Dansby concluded that Christopher had lumbar strain that was resolving. The plan was for Christopher to continue therapy for one to two days and then return to the clinic as needed.

Arthur Bass
Arthur, 17 years of age on the date of the accident, was sitting in the front passenger seat. Arthur contended that when the Corsica was rear-ended, his body moved forward, causing him to catch himself on the dashboard and injure both wrists. He further contended that he also injured his head, neck, and lower back in the accident. Arthur testified that: (i) he did not receive treatment for his wrist injuries because the pain was slight and did not last long; (ii) he experienced headaches the night of the accident only; (iii) the injuries to his lower back and the back of his neck were the most painful; and (iv) his injuries had all healed by the date of his last treatment, August 29. Arthur tried out for his school basketball team while he was receiving treatment. He thought he had two days of treatment remaining when he did this.
Arthur saw Dr. Caldwell over six visits between August 14 and August 29. According to Dr. Caldwell, Arthur reported symptoms of headache, neck pain, lower back pain and pain in both wrists. Cervical and lumbar X-rays revealed a loss of the normal cervical curve. Arthur did not present with muscle spasms. Dr. Caldwell's diagnosis was musculoskeletal injuries secondary to the accident with mild acute sprain/strain of the cervical and lumbar spine. Treatment included electrical muscle stimulation, ultrasound, ice and traction. Dr. Caldwell expected Arthur to fully recover within two to four weeks of his last visit.
Dr. Dansby examined Arthur on August 28. Arthur did not have muscle spasms. Arthur told Dr. Dansby that the physical therapy had helped, he was without complaints and had been trying out for the basketball team without difficulties. Dr. Dansby's assessment was that the cervical and lumbar strains had resolved. Even though Dr. Dansby opined that Arthur had completely recovered from his injuries by the date of this examination, he recommended Arthur have another day of therapy and return to the clinic as needed.

Written Reasons for Judgment
The trial court provided detailed written reasons for judgment. The court considered the accident to be one of "extremely minor impact, resulting in extremely minor *465 property damage and extremely minor personal injuries." The court found that some of the Corsica's occupants suffered "soft tissue irritation" but not "valid soft tissue injuries as claimed." Most notably, the court also found that Ms. Bass and her children "grossly and deliberately exaggerated not only what happened inside the vehicle but certainly the extent of any irritations or injuries in an overt attempt to increase potential recovery."
The court concluded that Ms. Bass, Alicia, Christina and Christopher suffered soft tissue irritation which had completely resolved within one week after the accident, and that they had no residual effects or disabilities. The court was explicitly clear in its opinion of the injuries sustained in the accident:
The Court feels that the evidence clearly shows that the sensations experienced by the parties were much more akin to that of having engaged in a relatively large amount of yard work or physical exercise when not used to it, than that of valid soft tissue injuries as the result of a valid automobile accident.
Arthur Bass was denied recovery upon the court's finding that he suffered no injuries as a result of the accident. Medical expenses for one week of treatment were awarded to each recovering party.

DISCUSSION

EXTENT OF INJURIES
Appellant argues that the trial court erred in finding that the injuries to Ms. Bass, Alicia, Christina and Christopher were completely resolved within one week with no residual effects or disabilities. She further argues that the trial court erred in finding that Arthur did not sustain any injuries as a result of the accident.
A court of appeal may not set aside a trial court's factual finding unless that finding is manifestly erroneous or clearly wrong. Stobart v. State Through Dept. of Transp. and Development, 617 So.2d 880 (La.1993). When factual findings are based on the court's determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard of review demands great deference to the trier of fact, because only the trier of fact can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Rosell v. ESCO, 549 So.2d 840 (La.1989); Slayton v. McDonald, 29,257 (La.App.2d Cir.2/26/97), 690 So.2d 914.
Our examination of this record reveals that a reasonable factual basis exists for the trial court's findings. The court was aided in its findings by the testimony of Matthew Parsons, an expert in biomechanical engineering. In order to analyze the accident scenario and determine the injury potential for the occupants of the Corsica, Parsons reviewed photographs of the two vehicles, the police incident report and the medical records of the occupants. Parsons never personally examined either vehicle nor talked to either driver. Parsons concluded that the collision did not cause a significant change in the Chevy's speed, therefore, there was an extremely low probability that any injury would result from the impact. Accordingly, he believed that the plaintiffs could not have been injured as a result of this collision. Parsons added that his main concern in examining the results of an accident is the change in speed of the vehicle at impact, not the vehicle's speed prior to impact.
Parsons reached his conclusion when he did not find "isolator stroke" on the Corsica's isolators. Parsons explained that isolators are a piston assembly connecting the rear bumper beam to the car. The isolators compress when the bumper is struck, causing the piston to leave scrape marks on an inner cylinder. The length of these scrape marks indicates the change in the vehicle's speed due to the rear-end collision. The photos showed no scrape marks on the Corsica's isolator cylinders. Parsons stated that scuff marks on an isolator are usually very evident, especially *466 in older vehicles because of accumulated dirt and grime, which would be easily scraped off by movement. The Corsica was a 1988 model.
Parsons testified that studies have shown that when there is no evident compression of the isolators, as in this case, the change in speed is below approximately 1.1 m.p.h. He compared this change in speed to the impact experienced when slowly backing into a curb. Ms. Bass had her foot on the accelerator at the time of impact, so the Corsica was not stationary when hit. When Parsons was asked how the Corsica's trunk could be damaged and the bumper not compressed since the bumper protrudes from the Corsica, Parsons opined that the front of the Bronco dipped when braking. He quickly added that this would not mean the force from the Bronco was applied at an angle as the force is still applied in a forward direction.
Parsons testified that the lack of damage to the Bronco is consistent with the lack of compression of the Corsica's isolators. He explained that the Bronco does not have significant energy absorbing capability in the front. Thus, the Bronco is expected to sustain damages even at very low change in speed impacts because the only way the Bronco can dissipate energy is to deform, dent or somehow displace it. There was no permanent deformation to the front of the Bronco. The only damage to the Bronco was a crack in the plastic license plate holder on the front bumper.
After determining the change in speed, Parsons next used the medical records to determine the physical responses of the Corsica's occupants. He concluded that the diagnoses of soft tissue injuries were not consistent with the magnitude and type of impact received by the Corsica. Thus, he did not believe that the reported injuries were related to the accident.
Regarding the practice of using the force of impact to directly measure the severity of an injury, this court has stated:
[T]his court has avoided the precedent of attempting to measure an injury in direct proportion to the force of a collision when medical experts and lay witnesses establish that a plaintiff sustained injuries.
... Under the facts of this case, we find no reason to use the force of the collision as the determining factor in assessing the severity of the plaintiff's injuries.

Starnes v. Caddo Parish School Bd., 598 So.2d 472 (La.App.2d Cir. 1992). (Citations omitted).
However, this court has also stated that "[w]hile the degree of injuries in vehicle accident cases may not be measured `in direct proportion to the force of a collision,'... neither, logically, should a court decline to consider and evaluate all of the evidence." Aaron v. Bolds, 566 So.2d 195 (La.App. 2d Cir.1990). (Citation omitted).
It is evident from the court's comments in its written reasons for judgment that the trial court gave the recovering plaintiffs little credibility. Only two of the Corsica's occupants, Alicia and Christopher, complained to Deputy Judd that they had been injured. No occupant sought medical treatment the day of the accident. However, all of the occupants visited a chiropractor with various complaints of soft tissue injuries the next day. We emphasize Ms. Bass's testimony that she sought the services of an attorney before seeking medical treatment.
Ms. Bass described the impact as hard, which was contradicted by Parsons' testimony. Ms. Bass also claimed that the collision forced her forward first and then backwards. Parsons countered that it is not possible for the occupant of a car that has been simply rear-ended to be first thrown forward upon impact. Instead, the occupant would have gone backwards first. In addition, Ms. Bass testified that her body struck the steering wheel. However, Dr. Caldwell and Dr. Dansby both testified that Ms. Bass did not tell them that she struck anything in the car. This failure to be honest with the court about what actually *467 happened inside the car at the moment of impact is a recurrent theme with the other occupants as well.
Like her mother, Alicia described the impact as hard. Once again, this description was contradicted by Parsons' testimony. Alicia insisted that she struck the seat in front of her on impact. However, neither Dr. Caldwell nor Dr. Dansby recalled Alicia telling them that she struck anything inside the car as a result of the collision. Christina testified that her body was thrown forward, then backward upon impact. As stated earlier in this opinion, this was not possible. Christina also testified that she injured her head and knee when she hit a suitcase sitting in her lap. Dr. Caldwell testified that Christina never told him that she struck anything inside the vehicle as a result of the impact. Dr. Dansby's examination notes attached to his deposition do not reflect that Christina ever reported this to him either.
Christopher testified that he hurt his head and left big toe when he hit a suitcase. However, Dr. Caldwell and Dr. Dansby both reported that Christopher did not give a history of having struck anything inside the car. Finally, Arthur, the oldest child, testified that when the Corsica was rear-ended, his body moved forward, forcing him to catch himself on the dashboard, injuring his wrists in the process. Once again, Dr. Caldwell and Dr. Dansby each testified that Arthur did not give a history of having struck anything inside the vehicle. Moreover, Arthur was well enough to try out for his school's basketball team while still receiving treatment. Arthur testified that he believed he tried out when he had two days of treatment remaining.
Appellant argues in her brief that "[t]he only evidence in the record regarding the nature, extent and duration of the injuries consists of the testimony of Dr. Dansby, Dr. Caldwell, plaintiff and her children." The credibility of Ms. Bass and her children is important because the complaints of pain and history furnished by each to Dr. Caldwell and Dr. Dansby played a significant role in the diagnosis of injury and relating that injury to the accident. We note the following testimony from Dr. Dansby's deposition:
Q: Doctor, there's a stipulation with respect to your opinion that these individuals were injured. Let me briefly follow that stipulation up. Would it be also correct to state or to say that if it were your opinion that these individuals were injured, that your opinion would be based upon the history the patient furnished to you.
A: Always is, yes.
Regarding the connection between a plaintiff's credibility and the diagnosis of plaintiffs injury, this court has stated:
The weight afforded a treating physician's testimony is largely dependent upon the facts upon which his opinion is based.... A claimant's lack of credibility on factual issues can serve to diminish the veracity of her complaints to a physician.

Perow v. Lenzly, 30,833 (La.App.2d Cir.8/19/98), 716 So.2d 519. (Citations omitted).
By stating that the Corsica's occupants exaggerated their injuries in hopes of increasing the damages award, the trial court is essentially stating that the plaintiffs were not truthful when registering their complaints with Dr. Caldwell and Dr. Dansby.
Based on this record, we cannot say the trial court was clearly wrong in finding the soft tissue irritations suffered by Ms. Bass, Alicia, Christina and Christopher Bass resolved a week after the accident, or that Arthur Bass did not suffer injuries in the auto accident.

GENERAL DAMAGES
Appellant next argues that the trial court erred in awarding Alicia, Christina, Christopher and her $250 each in general damages. Appellant suggests that proper awards would be $4,500 for her, $4,000 for *468 Alicia, $3,000 for Christina and $3,000 for Christopher.
The trier of fact has much discretion when assessing damages in cases of offenses, quasi offenses and quasi contracts. La. C.C. art. 2324.1. Before an appellate court may disturb such an award, the record must clearly reveal that the trial court abused its broad discretion in making the award, based on the facts and circumstances peculiar to the case and the individual under consideration. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). It is only after an articulated analysis of the facts discloses an abuse of discretion that resort to prior awards in similar cases is proper. Dixon v. Tillman, 29,483 (La. App.2d Cir.5/7/97), 694 So.2d 585, writ denied, 97-1430 (La.9/19/97), 701 So.2d 174.
Ms. Bass, Alicia, Christina and Christopher received only soft tissue irritations in this minor impact collision. Any suffering and inconvenience they endured ended within a week. The trial court did not believe their testimony regarding the extent of their injuries, instead finding that they had deliberately exaggerated their injuries in the hopes of increasing their damages award. Under these circumstances, we cannot say that the general damages award was an abuse of the trial court's discretion.

MEDICAL EXPENSES
Appellant contends that the trial court erred in concluding that Dr. Caldwell and Dr. Dansby were entitled to be compensated for only one week of treatment. The trial court found that any injuries suffered in the accident had resolved within one week after the accident. Nonetheless, a tortfeasor is required to pay for the cost of overtreatment or unnecessary medical treatment, including chiropractic care, unless the overtreatment was incurred by the victim in bad faith. Sumrall v. Sumrall, 612 So.2d 1010 (La.App. 2d Cir.1993); Starnes v. Caddo Parish School Bd., supra. The trial court believed that the occupants "grossly and deliberately exaggerated... the extent of any irritations or injuries in an overt attempt to increase potential recovery." In other words, Ms. Bass, Alicia, Christina and Christopher continued with treatment despite having already healed for the sole purpose of increasing quantum. This constitutes undergoing overtreatment in bad faith. This assignment of error is without merit.

DECREE
At appellant's cost, the judgment is AFFIRMED.