963 So.2d 486 (2007)
Richard GREEN, individually and as Administrator for his minor children, Carlin Seth Green and Steven Chase Green, Plaintiff-Appellee,
v.
Rodney Lyle NUNLEY and State Farm Mutual Automobile Insurance Company, Defendants-Appellants.
Lynn Green, Plaintiff-Appellee,
v.
Rodney Lyle Nunley, and State Farm Mutual Automobile Insurance Company, Defendants-Appellants.
Nos. 42,343-CA, 42,344-CA.
Court of Appeal of Louisiana, Second Circuit.
August 15, 2007.
*488 Kitchens, Benton, Kitchens & Black by Graydon K. Kitchens III, Minden, for Appellants Rodney Lyle Nunley and State Farm Mutual Automobile Insurance Company.
Chris J. Roy, Jr., Alexandria, for Appellee Richard Green.
Robert Lawrence Beck, Jr., Alexandria, for Appellee Lynn Green.
Before GASKINS, DREW and LOLLEY, JJ.
DREW, J.
Richard Nunley and his liability insurer, State Farm Mutual Automobile Insurance Company, appeal the finding of liability and award of damages in this personal injury action arising from a vehicular accident. We affirm.

FACTS
On the morning of September 8, 2003, Lynn Green was driving her sons, Steven Chase Green ("Chase") and Carlin Seth Green ("Seth"), in her white 1987 Chevrolet pickup truck from Castor to a pediatrician's office in Shreveport. Mrs. Green was proceeding northbound along a stretch of Highway 71, which is a four-lane road divided by a median and which is known as Barksdale Blvd. Jimmie Davis Highway ("Jimmie Davis") forms a T-type intersection with Highway 71, and at that intersection, there is a third lane on Highway 71 by which northbound motorists can make left turns onto Jimmie Davis. As Mrs. Green approached the intersection, her vehicle entered the turn lane in order to make a left turn onto Jimmie Davis.
At the same time, Rodney Nunley, who delivered bread as an independent contractor for a bakery, was driving his bread truck southbound in the outside lane on Highway 71. His truck collided with Nunley's *489 truck as she attempted to make her left turn. The left front of Nunley's truck struck the right front fender wall on the passenger side of Mrs. Green's truck and then behind the passenger door. The collision caused Mrs. Green's truck to spin around, so that her truck ended up facing southeast.
Richard Green, Mrs. Green's husband, filed suit on behalf of his sons, Chase and Seth, against Nunley and his insurer State Farm. Mrs. Green filed a separate suit on her own behalf against the same defendants. The two lawsuits were consolidated.
Following a bench trial on the merits, the trial court rendered judgment in favor of plaintiffs. The court concluded that Mrs. Green turned with a green arrow and found that Nunley was solely at fault for causing the accident. Mrs. Green was awarded general damages of $25,000.00, medical expenses of $3,028.24, and $1,325.00 for the damages to her vehicle. Mr. Green, on behalf of Chase, was awarded $10,000.00 in general damages and $7,439.34 in medical expenses. Mr. Green, on behalf of Seth, was awarded $5,000.00 in general damages, $4,493.71 in past medical expenses, and $1,000.00 in future medical expenses. Defendants have appealed.

DISCUSSION  LIABILITY
Defendants argue on appeal that the trial court erred in finding that Mrs. Green satisfied her burden of proof on the issue of liability. They contend that most of the fault for the accident, if not all of it, should have been assigned to Mrs. Green.
An appellate court may not set aside a trial court's finding of fact in the absence of manifest error or unless it is clearly wrong, and where two permissible views of the evidence exist, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Cole v. State, Department of Public Safety & Corrections, 2001-2123 (La.9/4/02), 825 So.2d 1134; Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880 (La.1993). Even though an appellate court may feel its own evaluations and inferences are more reasonable than the fact finder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Cole, supra; Rosell v. ESCO, 549 So.2d 840 (La.1989). To reverse a fact finder's determination, the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court and that the record establishes that the finding is clearly wrong. Stobart, supra.
When findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact's findings. Rosell, supra.
Defendants urge the application of La. R.S. 32:104(A), which provides:
No person shall turn a vehicle at an intersection unless the vehicle is in proper position upon the roadway as required in R.S. 32:101, or turn a vehicle to enter a private road or driveway, or otherwise turn a vehicle from a direct course or move right or left upon a roadway unless and until such movement can be made with reasonable safety.
In its reasons for judgment, the trial court referred to La. R.S. 32:232(1)(b), which states:
Vehicular traffic facing a green arrow signal, shown alone or in combination with another indication, may cautiously enter the intersection only to make the movement indicated by such arrow, or such other movement as is permitted by *490 other indications shown at the same time. Such vehicular traffic shall yield the right-of-way to pedestrians lawfully within an adjacent crosswalk and to other traffic lawfully using the intersection.
Because a left turn is one of the most dangerous maneuvers for a driver to execute, there is a presumption of negligence on a left-turning motorist involved in a motor vehicle accident. See Hughes v. Scottsdale Ins. Co., 35,043 (La.App.2d Cir.8/22/01), 793 So.2d 537. This is in accord with the statutory duty found in La. R.S. 32:122 that a left-turning motorist at an intersection "shall yield the right of way to all vehicles approaching from the opposite direction which are within the intersection or so close thereto as to constitute an immediate hazard."
A motorist attempting to make a left turn is under a duty to exercise a very high degree of care, even when executing the turn on the authority of an illuminated left turn signal. Christaw v. O'Bryant, 535 So.2d 1020 (La.App. 2d Cir.1988), writ denied, 536 So.2d 1223 (La.1989).
Although a burden rests on the motorist who desires to make a left turn to explain how the accident occurred and to show that he is free from negligence, this burden may be discharged by the left-turning motorist proving that the left turn arrow was illuminated. See Lewis v. Smith, 40,590 (La.App.2d Cir.1/25/06), 920 So.2d 920.
Mrs. Green testified that when her vehicle entered the turn lane at the intersection, there were two vehicles stopped in front of her. The light was red. When the light changed to green, the first vehicle made its left turn, followed by the second vehicle, which was a black SUV. Mrs. Green asserted that when the green arrow became illuminated, her car was stopped. She began making her turn through the intersection and the accident occurred.
Mrs. Green's older son, Chase, who was 12 at the time of the accident, recalled that there was an SUV in front of their truck in the turn lane. Chase testified that his mother had the green light and the green arrow when she began her turn. Chase also stated that he saw the arrow change from red to green, then he agreed that the signal went from a red light to a green arrow; Chase explained that he generally meant what his mom had earlier testified about regarding the traffic light sequence.
Mrs. Green did not see Nunley's bread truck prior to the collision. She conceded that there was nothing blocking her view of southbound traffic on Highway 71 while she was waiting to make her turn. Mrs. Green was not looking at oncoming traffic as she was looking at the traffic light waiting for the green arrow. Chase also did not see Nunley's truck until after the collision.
Nunley described his bread truck as a traveling billboard measuring 8 feet wide and 28 feet long, with blue, red, and yellow stripes across the top. He testified that he was driving in the right lane as he approached the intersection, with his vehicle being the only southbound vehicle in the immediate area.
According to Nunley, the traffic light facing him as he drove toward the intersection was green at the time and it never changed. When his truck was approximately three truck lengths from the intersection, a white SUV turned left in front of him. The white SUV's maneuver startled him, so he removed his foot from the accelerator. According to Nunley, following right behind the white SUV in making the left turn was Mrs. Green's truck. Nunley did not think that Mrs. Green even looked before she turned. Nunley slammed on his brakes, and just prior to making impact *491 he steered to the right to avoid a head-on collision.[1]
Nunley estimated that he decelerated to 30-35 mph at the time of the collision. Nunley was unable to recall what happened immediately after the impact as he was knocked unconscious. His truck apparently rolled into a third vehicle after he had been removed from the truck.
Thomas Camp, a patrol officer with the Bossier City Police Department, investigated the accident. He determined that the traffic signals were sequencing properly. His investigation also determined that three vehicles were hit: the bread truck hit the Green truck and then hit a car parked on the shoulder. Officer Camp guessed that the inside lane was where the collision between the Green truck and Nunley truck occurred.[2] Officer Camp concluded that Mrs. Green committed a violation by turning left in disregard of the traffic signal, and that Nunley committed no violations; nevertheless, nobody was issued a citation.
Based upon our review of the record, we cannot conclude that the trial court was clearly wrong in finding Nunley solely at fault for the accident. The evidence establishes that Mrs. Green discharged her burden and proved Nunley's negligence. Officer Camp determined that the lights were working properly. Therefore, because the trial court believed Mrs. Green's position that she turned when she had the green arrow, this means that Nunley proceeded through the intersection against a red light. La. R.S. 32:232(1)(b) commands that a motorist making a left turn protected by a green arrow yield the right of way to "pedestrians lawfully within an adjacent crosswalk and to other traffic lawfully using the intersection." (Our emphasis.) Nunley was neither a pedestrian nor, as a driver proceeding through a red light, "traffic lawfully" using the intersection.
Once Mrs. Green had a green arrow, she was under no obligation to keep her vehicle stationary until she determined if Nunley, who was approaching the intersection, was going to heed the red light. As noted by this court:
A motorist favored with a green signal when approaching an intersection cannot depend exclusively on the favorable light. Rather, the motorist has a duty to watch for vehicles already in the intersection when the light changed; this duty does not extend to looking for traffic that has not yet entered the intersection.
Lewis, 40,590 at p. 6, 920 So.2d at 924-5.
Mrs. Green's statement to Dr. Gleason as recorded in her patient history that she turned on a green light does not lessen Mrs. Green's credibility. Although Dr. Gleason undoubtedly pays careful attention to a patient's description of an accident in order to learn about the dynamics of a wreck as it relates to possible injuries, it would not be important to his treatment whether there was a green light or green arrow.

DISCUSSION  DAMAGES
Mrs. Green's Injuries
Immediately after the accident, Mrs. Green was transported by ambulance to the emergency room of a local hospital. She complained of pain in the chest wall, neck, and right hip. X-rays of the cervical spine, chest, and right hip were all negative. *492 The ER doctor's diagnosis was a cervical strain and a right hip contusion. Mrs. Green was discharged, told to take Advil for pain, given a prescription for Lortab for intense pain, and instructed to follow up with her doctor.
The evening of the accident, Mrs. Green felt extremely sore. In particular, her neck, chest, lower stomach, and right buttock were hurting. Mrs. Green recalled that she remained extremely sore for the rest of the week and could hardly move. Her husband took off a week of work to help care for her and the children.
Mrs. Green was evaluated by Dr. Austin Gleason, an orthopaedic surgeon, on September 10. She complained of continued soreness in her arms, back, stomach, right hip, and right ribs. Mrs. Green exhibited bruises over the left knee, right pelvic crest, and left biceps. There was also a contusion over the right greater trochanter. Decreased ranges of motion in the neck, lower back, and right hip were noted. Dr. Gleason's impression was that Mrs. Green had a myoligamentous injury of the cervical and lumbar spines, and contusions of the left arm, right hip, and left knee. He recommended that Mrs. Green avoid vigorous activities, but that she should walk for exercise and do back and neck exercises.
Mrs. Green returned for an evaluation by Dr. Gleason on October 1. It was noted that Mrs. Green was doing better in all regards, but she complained of continued pain in the mid-thoracic region of the spine, pain over the right greater trochanter where she had had a severe bruise, and numbness and tingling sensations in her left lateral thigh that may have been related to her driving.[3] Mrs. Green reported that prior to the accident she often walked up to four miles a day, but had recently only walked a mile and then had trouble getting out of bed the next day. Dr. Gleason believed that Mrs. Green was responding reasonably well, and he told her to slowly push toward normal activities and that the problems in her left lateral thigh should go away. Dr. Gleason also noted that the contusions on her arm and knee appeared to be healing well.
Dr. Gleason next examined Mrs. Green on October 22, 2003. It was noted that Mrs. Green's neck felt better, but she was still having pain in her upper thoracic spine, posterior midline. She estimated that her lower back was 50% better. She still had pain that was localized in her right buttock and right piriformis area, especially when using stairs.[4] Dr. Gleason's new diagnosis was piriformis tendinitis of the right hip, which he related to the auto accident.[5] Although hip injections were mentioned as a possible treatment, Mrs. Green preferred to wait and to try to increase her activities.
On November 17, 2003, Mrs. Green told Dr. Gleason that her hip pain was better by 50% following an injection over her *493 right piriformis.[6] She complained of left lower back pain, and she continued to have some limitation of motion. Mrs. Green also complained of pain in her knee that was not bothering her during her October visits. Dr. Gleason found a tender area in her right knee with possible minimal swelling, which he thought may have been caused by a hamstring tendon strain. Although he would have expected the right knee problem to manifest itself earlier, he recognized that it may have been masked by the pain from other injuries. Mrs. Green was given a prescription for Ultracet for pain relief, which was the first time Dr. Gleason prescribed pain medication for her.
Mrs. Green was examined by Dr. Gleason on December 1, 2003. She stated that she was 50% better in her hip and could live with it. Dr. Gleason felt that she probably still had piriformis tendinitis as she still experienced pain in the posterior trochanter area. He suggested that she return to her normal activities and come back for an injection if her symptoms continued. Mrs. Green was not treated by Dr. Gleason again for nearly two years.
Dr. M. Alan Brown, Mrs. Green's internist, examined her on April 12, 2004. Mrs. Green complained to Dr. Brown that she had soreness in her upper chest. She testified that her chest hurt after the accident, but felt better until one morning when it began hurting as she tried to put her seatbelt on. This pain, which she attributed to a respiratory illness, worsened with coughing or deep breathing. Dr. Brown's diagnosis was musculoskeletal CP, and he prescribed Mobic, an anti-inflammatory drug.
On November 19, 2005, Dr. Gleason treated Mrs. Green, who complained of pain over the piriformis tendon in the posterior aspect of the right hip in the right buttock area, with the pain exacerbated by flexion of the hip and external rotation. X-rays of the pelvis and right hip ordered by Dr. Gleason were normal. Dr. Gleason's impression was piriformis tendinitis on the right. He encouraged Mrs. Green to continue taking Mobic to see if it helped. Injection of the hip, about which Mrs. Green was reluctant, was suggested as a last resort.
Dr. Gleason explained that the types of injuries sustained by Mrs. Green usually resolve on their own over time. However, Dr. Gleason testified that the longer piriformis pain lasts, the worse the prognosis is for it to resolve, although he had never seen a piriformis tendinitis condition that was disabling. Dr. Gleason felt that the pain Mrs. Green was experiencing was a chronic condition. Mrs. Green stated that pain will sometimes flare up in the area of her right buttock if she does a lot of driving or standing. She described this pain as dull, sharp, and radiating.
Dr. Gleason has never recommended surgery for treatment of any of her conditions, nor has he prescribed physical therapy. The only physical limitation he placed on her was to take it easy for a few weeks.
Chase's Damages
Chase testified that the collision caused him to be thrown into the passenger door, and he thought he hit the passenger side window with his head. He believed that he received a "little, bitty" scratch on his head. Mrs. Green remembered Chase had blood and a scratch on the top of his head.
Although Mrs. Green recalled that Chase said his head hurt when they were *494 in the ambulance, the ER records reflect that Chase had no complaints when he was brought to the ER following the accident, and the ER doctor found no evidence of any injury. Chase recalled that while in the ambulance, he was more concerned about the conditions of his mother and brother than about himself. The day after the accident, Chase was examined by his pediatrician for respiratory ailments.
Chase testified that he began having problems about two days after the accident. He began to feel soreness and then stabbing pain in his back and shoulder blades. He later noticed that he had bruises on his knees and his hand.
Dr. Gleason examined Chase on October 8, 2003. Chase complained that on the day after the accident, he began experiencing pain in the areas of his shoulder blades and lower back, and that he had bruises on his right knee and right index finger, and a scratch on the right side of his head. Although most of his symptoms had resolved by the time he visited Dr. Gleason, Chase asserted that he still had pain in his neck and upper back around his shoulder blades. Chase also reported missing four days of school after the accident, and several half-days since then. Dr. Gleason found a 50% range of motion in Chase's neck and upper back. Dr. Gleason's impression was that Chase had a myoligamentous injury of the upper thoracic spine, and he decided to conservatively treat Chase. His recommendation was for Chase to slowly approach normal activities and to be excused from PE classes at school.
Dr. David Adams examined Chase on December 9, 2003.[7] Dr. Adams noted that carrying a school backpack had increased Chase's pain in the area of his shoulder blades. Chase, who had full range of motion, also complained of frequent headaches. Dr. Adams's impressions were that Chase had bilateral periscapular myofascial pain syndrome and lumbar sprain/strain. Dr. Adams noted that Chase's lower back pain and periscapular pain were centralized and radiating into the extremities. This lower back pain was not present when Dr. Gleason had examined Chase.[8] Dr. Adams recommended physical therapy, and for Chase to have an aggressive home program of ice, stretching of the periscapular muscles, and extension exercises for the lumbar spine.
Dr. Gleason next treated Chase on January 2, 2004. It was noted that the therapy was dramatically helping Chase, and that he was virtually asymptomatic except for some mild stiffness. Dr. Gleason recommended that Chase finish therapy and go back to PE. Chase returned to Dr. Gleason on January 19, 2004. Chase reported occasional pain, for which he took Tylenol, and that he had resumed his normal activities. Dr. Gleason noted that Chase had a near normal range of motion with no spasm, and he was discharged to return only if necessary.
Even after Chase was discharged in January 2004, he continued to have periodic problems with the neck and shoulder. According to Mrs. Green, she had to bring Tylenol or Advil to Chase's school numerous times because he complained that his desk made his neck and back hurt, and on other occasions she had to check him out of school. Chase also treated his pain with heating pads, stretching, and soakings. However, he returned to Dr. *495 Gleason on February 2, 2005, because his pain would stop for a few days and then come back. Everyday activities could cause the pain to return.
Chase complained to Dr. Gleason in February 2005 that he continued to have pain in his neck and upper thoracic spine, with occasional headaches and pain between his shoulder blades. MRIs of Chase's cervical and thoracic spines were ordered. These MRIs, which were not performed until October 18, 2005, were unremarkable.[9] When evaluated by Dr. Gleason the next day, Chase reported pain in his neck and thoracic spine when sitting in certain positions, which Dr. Gleason thought might be caused by growing pains in his spine. Dr. Gleason did not think anything serious was occurring, and he encouraged Chase to do light weightlifting and stretching exercises for his back and neck. It was recommended that Chase return if necessary. Dr. Gleason agreed that the pain complaints during the 2005 examinations were consistent with the earlier complaints that were attributed to the accident.
Chase has continued to have periodic problems with his neck and shoulder, although the pain has not been as severe as it was right after the accident. He felt better after being released by Dr. Gleason in 2004, and Chase thought his pain could be treated with Tylenol or stretching.
Chase's recreational activities were not severely limited by his injuries. During the fall of 2003, Chase was able to hunt deer, climb into a box stand, shoot a bow once or twice, and fish. Chase testified that he had returned to normal activities at the time of the August 2006 trial, even when he felt pain. He was able to play Little League baseball in the summers of 2004 and 2005.
Chase did not mention lower back pain when he was first treated by Dr. Gleason. However, Chase explained that he did not complain about it to Dr. Gleason during that examination because he did not have the pain at that time. According to Chase, this pain materialized after he carried his backpack.
Seth's Injuries
Seth, who was four years old at the time of the accident, was seated in his car seat which was positioned in the middle of the pickup's only bench seat. Mrs. Green recalled that after the accident, Seth had blood all over his face and shirt, which alarmed her because she did not know exactly where he was cut. She did not see him make impact with any part of the truck during the accident. Chase remembered Seth bleeding from the mouth and spitting out a piece of glass.
Like his mother and brother, Seth was taken to the ER by ambulance. The notes from the ER reflect that Seth was not crying and had little to say. Mrs. Green stated that Seth was only crying a little just after the accident, and was calm. Seth had two lacerations on the right side of his face. One was 2.5 cm long and on his cheek, and the other was 1.5 cm long and at the corner of his mouth. Seth was sedated and both lacerations were sutured. A piece of glass was found in the shorter laceration. A C-spine X-ray was negative, as was a CT scan of the brain and facial bones. Mrs. Green believed the CT scans were performed because the ER doctors were concerned that Seth was not crying as much as they thought he would, and they wanted to ensure there was no brain damage. The Greens were instructed at discharge to check Seth every two hours because of a possible head injury.
*496 Some glass remained in Seth's mouth even after he was discharged and returned home. He missed preschool the week after the accident. Seth's cheek was bruised for about a month, and his injury made it hard for him to eat. At times, Seth was fearful of eating because it might be painful.
On October 6, 2003, Seth was examined by otolaryngologist Dr. David Hilton on a referral from Seth's pediatrician. Dr. Hill found a 1 cm subcutaneous mass in Seth's right cheek that was compatible with a small resolving hematoma.
In April of 2004, Dr. Barron O'Neal, a plastic surgeon, examined the scar that remained from the laceration on Seth's cheek. Dr. O'Neal recommended scar revision surgery, which would cost approximately $1,000. It was noted by Dr. O'Neal that some permanent scarring would remain even if Seth had the surgery.
Mrs. Green testified that Seth gets upset by the scar on his face, and it bothers him at times. It was agreed that although the scar remains noticeable, it has gotten better. The Greens had delayed the scar revision in hopes that improvement over time would make the procedure unnecessary, but now plan on having it done.
Mrs. Green testified that Seth became hysterical when he got into a car the next day because he was worried about another accident. He still gets nervous any time they drive through the intersection of Jimmie Davis and Highway 71. The Greens have decided not to seek counseling for Seth, but rather to discuss issues within the family as they come up.
Summary
Defendants argue that the general damages awards for Mrs. Green and her two sons were excessive. The defendants also protest the amount of special damages awarded for Chase.
The trier of fact has much discretion when assessing damages in cases of offenses, quasi offenses, and quasi contracts. La. C.C. art. 2324.1. Before an appellate court may disturb an award for general damages, the record must clearly reveal that the trial court abused its broad discretion in making the award, based on the facts and circumstances peculiar to the case and the individual under consideration. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994).
It is only after an articulated analysis of the facts discloses an abuse of discretion that resort to prior awards in similar cases is proper. Dixon v. Tillman, 29,483 (La.App.2d Cir.5/7/97), 694 So.2d 585, writ denied, 97-1430 (La.9/19/97), 701 So.2d 174.
The proper procedure for determining whether an award is excessive is to determine whether the amount can be supported under the interpretation of the evidence most favorable to the plaintiff which reasonably could have been made by the trier of fact. Manuel v. State Farm Mut. Auto. Co., 30,765 (La.App.2d Cir.8/19/98), 717 So.2d 277.
Based upon this record, we cannot conclude that the trial court abused its broad discretion in finding that Seth was entitled to general damages of $5,000.00, that Chase was entitled to general damages of $10,000.00, and that Mrs. Green was entitled to general damages of $25,000.00. The general damages for all three are on the high side of reasonable, but not so excessive that an appeals court should reduce the awards.
Defendants additionally argue that the trial court erred in its award of special damages to Chase. They apparently *497 believe Chase can only recover for his medical expenses incurred prior to January 19, 2004, as they assert that any treatment after this date was for conditions not related to the automobile accident.
We note that Dr. Gleason agreed when asked if it was his opinion that more likely than not, his treatment, as well as all the other treatment of Chase, was related to the car accident. He also agreed that the complaints of pain made in 2005 were consistent with the complaints made earlier. Finally, we are mindful that a tortfeasor is required to pay for the cost of overtreatment or unnecessary medical treatment, unless the overtreatment was incurred by the victim in bad faith. See Sumrall v. Sumrall, 612 So.2d 1010 (La. App. 2d Cir.1993); and Bass v. Allstate Ins. Co., 32,652 (La.App.2d Cir.1/26/00), 750 So.2d 460. There is no evidence of bad faith on the part of Chase in seeking medical treatment for the injuries he sustained in the collision. This argument is without merit.

CONCLUSION
At appellants' costs, the judgment is AFFIRMED.
NOTES
[1] The officer who investigated the accident found that Nunley's truck was damaged in the mid-front and driver's side front.
[2] Officer Camp testified that Nunley told him he was traveling in the inside lane at the time of the accident.
[3] Mrs. Green had not complained of this numbness and tingling during her first visit. Dr. Gleason explained that numbness in the left lateral thigh is frequently seen after a lap belt bruises the lateral femoral cutaneous nerve. Dr. Gleason also explained in his deposition that the pain in Mrs. Green's right hip was caused by tendinitis, but the left hip pain seemed to be radiating from her lower lumbar spine or may have been caused by her favoring her right hip.
[4] Dr. Gleason explained that the piriformis is a large tendon located about two inches toward the buttock from the bony prominence, or trochanter, of the hip.
[5] Piriformis tendinitis is an inflammation of the tendon. Dr. Gleason testified that the reason he wrote new diagnosis regarding the right hip tendinitis was because the pain had localized, in that it went from a bruise to a tendinitis pain in the muscle.
[6] This injection was not documented in the record, and Dr. Gleason stated that he had no definite evidence that he gave Mrs. Green an injection.
[7] Chase was unable to see Dr. Gleason at that time as he was out of town. Mrs. Green took Chase to Dr. Adams because Chase had called from school complaining of severe pain.
[8] Chase stated that before he saw Dr. Adams, the pain in his lower neck, lower back, and shoulder blades would go away and then flare up.
[9] The MRIs were delayed until October because of insurance payment issues.